**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

IN CLERKS OFFICE

2006 MAR 14 P 3: 54

U.S. DISTRICT COURT
DISTRICT OF MASS.

THE UNITED STATES OF AMERICA, and

THE STATES OF CALIFORNIA, DELAWARE,
FLORIDA, HAWAII, ILLINOIS, INDIANA,
LOUISIANA, MICHIGAN, NEVADA, NEW
HAMPSHIRE, NEW MEXICO, TENNESSEE,
TEXAS, and

THE COMMONWEALTHS OF
MASSACHUSETTS and VIRGINIA, and

THE DISTRICT OF COLUMBIA,

ex rel. ALLISON KELLY & FRANK GARCIA,

    Plaintiffs,

v.

NOVARTIS AG, NOVARTIS
PHARMACEUTICALS CORPORATION, and
GENENTECH, INC.,

    Defendants.

CA 10465 NG

*FILED IN CAMERA*
*and UNDER SEAL*

MAGISTRATE JUDGE _____

RECEIPT # 71087
AMOUNT $ 250
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 3/14/06

**COMPLAINT**

**INTRODUCTORY STATEMENT**

This is an action brought on behalf of the United States of America by Plaintiffs

ALLISON KELLY and FRANK GARCIA (hereinafter referred to as "Relators") against

Novartis, AG, and its subsidiary Novartis Pharmaceuticals Corporation (collectively referred to

as "Novartis"), and Genentech, Inc. ("Genentech") (collectively, "the Defendants") pursuant to

the *Qui Tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729-33 ("Federal

FCA" or "FCA"), and on behalf of the above named States under their respective State False

Claims Acts ("State FCAs") (together referred to herein as "*Qui Tam* Action"). Pursuant to 31

U.S.C. § 3730 (b)(2), and comparable provisions in State FCAs, this action is brought in camera and under seal.

The Relators in this case are present and former employees of Novartis and Genentech, respectively. The allegations of this Complaint arise from their first-hand knowledge, as pharmaceutical sales representatives, of the practices of the Defendants. The Defendants in this case have violated the Federal and State FCAs, the Medicare and Medicaid Anti-Kickback Act, and the Federal Food, Drug, and Cosmetic Act by engaging in numerous unlawful activities in their co-marketing of the drug Xolair® (Omalizumab) (a drug treating certain forms of asthma)(hereafter "Xolair") from June 2003 to the present. The Defendants' unlawful activities include, without limitation: (1) "off-label" marketing of Xolair for unapproved indications; (2) encouraging, aiding, abetting, and causing physicians and others to falsely represent facts on Statement of Medical Necessity forms ("SMNs") for Xolair; (3) offering and paying kickbacks to physicians and others; and (4) improperly targeting disproportionate share hospitals ("DSH's") and other hospitals receiving federal funds, all in order to increase reimbursement for Xolair from governmental health insurance programs. Defendants' actions and omissions have caused physicians around the United States to prescribe and administer Xolair to their patients for off-label purposes, and to inaccurately represent its medical necessity and eligibility for government health insurance reimbursement, thereby causing improper and illegal billings to the state and federal governments. These practices are detailed in the pages below, and in Relators' Disclosure Statement served on the state and federal plaintiffs in this matter.

## **JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this action under the Federal FCA pursuant to 28

U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730, and has supplemental jurisdiction

over the State FCA claims pursuant to 28 U.S.C. §1367.

2.      Venue is appropriate as to the Defendants in that the Defendants transact business

in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by the

Defendants in this judicial district. Therefore, within the meaning of 28 U.S.C. § 1391(b) and (c)

and 31 U.S.C. § 3732(a), venue is proper.

3.      To Relators' knowledge, jurisdiction over this action is not barred by 31 U.S.C. §

3730(e): there is no civil suit or administrative proceeding involving the allegations and

transactions herein to which the United States is a party; there has been no "public disclosure" of

these allegations or transactions; and Relators are the "original source" of the information upon

which these allegations are based.

## **THE PARTIES**

4.      Relator Allison Kelly is a citizen of the United States of America. She is a

resident of Stamford, Connecticut, and a current employee of Novartis. Relator Frank Garcia is a

citizen of the United States of America. He is a resident of Alice, Texas and a former employee

of Genentech. These Relators bring this *Qui Tam* action based upon direct and unique

information obtained during the period of their employment as pharmaceutical sales

representatives.    Relators are providing a "disclosure statement" to the United States and to the

Plaintiff States, as required by law.

5.      Defendant Novartis AG is a publicly-traded diversified, global pharmaceutical

company with operations throughout the United States and in many other countries. Its principal

place of business is Basel, Switzerland. Novartis is traded on the New York Stock Exchange under the symbol "NVS." Novartis AG operates in the United States through Defendant Novartis Pharmaceuticals Corporation headquartered in East Hanover, New Jersey. Novartis develops and markets pharmaceuticals in various therapeutic areas, including cardiovascular and metabolism, neuroscience, respiratory and dermatology, specialty medicines, oncology and hematology, transplantation and immunology, and ophthalmic diseases, as well as arthritis, bone, gastrointestinal, hormone replacement therapy, and infectious diseases. One of the drugs manufactured by Novartis is Xolair, approved by the United States Food and Drug Administration for allergic, moderate to severe, persistent asthma in individuals aged 12 and above. (The complete description of Xolair's approved use is set forth below.) Novartis conducts business in the Commonwealth of Massachusetts and every state within the United States.

6. Defendant Genentech is a publicly-traded, diversified, biotechnology company headquartered in San Francisco, California. Genentech engages in the discovery, development, manufacture, and commercialization of biotherapeutics for various medical needs. The company provides products for the treatment of cancer, allergic asthma, plaque psoriasis, hormone deficiency, heart attack, blood clots in the brain and lungs, and cystic fibrosis. Shares in Genentech are traded on the New York Stock Exchange, under the symbol "DNA." Genentech conducts business in the Commonwealth of Massachusetts and every state within the United States. Genentech was the original developer of the drug Xolair, and co-promotes the drug with defendant Novartis, which produces it.

-4-

## FEDERAL AND STATE LAWS

### Government Health Insurance Programs

7.      The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, (hereinafter "Medicare") is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. The program is overseen by the United States Department of Health and Human Services. Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify under the terms and conditions of the Medicare Program. Payments made under the Medicare Program include payment for certain prescription drugs used during treatment at an appropriate medical facility and otherwise. Pursuant to the Medicare Prescription Drug Improvement and Modernization Act of 2003, effective January 1, 2006, Medicare Part D took effect, extending prescription drug coverage to all Medicare eligible persons who choose to participate in Part D.

8.      The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§1396-1396v (hereafter "Medicaid"), is a Health Insurance Program administered by the Government of the United States and the various individual States and is funded by State and Federal taxpayer revenue. The Medicaid Program is overseen by the United States Department of Health and Human Services. Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid.

9.      The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the

- 5 -

Uniformed Services and to spouses and children of active duty, retired and deceased members. The program is administered by the Department of Defense and funded by the Federal Government. CHAMPUS pays for, among other items and services, prescription drugs for its beneficiaries.

10.     The federal government, through its Departments of Defense and Veterans Affairs, maintains and operates medical facilities including hospitals, and receives and uses federal funds to purchase prescription drugs for patients treated at such facilities and otherwise. In addition, under the Public Health Service Act, the Section 340B Drug Pricing Program, and the Veterans Health Care Act of 1992, the federal government directly or indirectly provides funds to certain other federal agencies and to state and local facilities and programs, including to non profit disproportionate share hospitals ("DSH"). *See generally* 38 U.S.C. § 8126.

11.     The Federal Employees Health Benefits Program ("FEHBP") provides health care benefits for qualified federal employees and their dependents. It pays for, among other items and services, prescription drugs for its beneficiaries. (Together these programs described in paragraphs 8-11 shall be referred to as "Federal Health Care Programs" or "Government Health Care Programs").

**The Federal Food, Drug and Cosmetic Act**

12.     The Federal Food, Drug and Cosmetic Act ("FFDCA"), 21 U.S.C. §§ 301, *et seq.*, prohibits the distribution of new pharmaceutical drugs in interstate commerce unless the Food and Drug Administration ("FDA") has determined that the drug is safe and effective for its intended use. 21 U.S.C. § 355 (a) and (d). An approved drug may be prescribed by doctors for uses other than those approved by the FDA, but manufacturers are prohibited from marketing or promoting the drug for such unapproved or "off label" uses. 21 U.S.C. § 331(d). If the

- 6 -

manufacturer intends to promote the drug for a new unapproved use, an application for the proposed new use must be filed with the FDA (or obtain an exemption therefrom) and any promotional materials concerning unapproved uses must meet strict statutory and regulatory requirements. *See* 21 U.S.C. §§ 360aaa, *et seq*.

13.     Whether a drug is FDA-approved for a particular use determines whether a prescription of the drug is reimbursed under many, if not all, Government Health Insurance Programs, including Medicaid and the programs described in paragraph 11 above. Reimbursement under Medicaid and these other programs is, in most circumstances, available only for "covered outpatient drugs." 42 U.S.C. §1396b(i)(10). Covered outpatient drugs do not include drugs that are "used for a medical indication which is not a medically accepted indication." *Id.* §1396r-8(k)(3). A medically accepted indication includes a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is included in a specified drug compendia. *Id.* §1396r-8(k)(6). Thus, unless a particular off-label use for a drug is included in one of the identified drug compendia, a prescription for the off-label use of that drug is not eligible for reimbursement under Medicaid. There is a single exception: in certain circumstances Medicaid will reimburse the prescription of certain single-source or multi-source innovator drugs for an "off label" use where the individual State has determined, *inter alia*, that the drug is essential to the health of beneficiaries. 42 U.S.C. §1396r8(a)(3).

14.     The FFDCA provides criminal penalties for the dissemination of written information to health care providers regarding the safety, effectiveness, or benefit of the use of a drug that is not described in the FDA approved labeling of the drug, if that written information fails to conform to the law's requirements. 21 U.S.C. §§ 331(z), 333(a)(1)-(2), 360aaa. A manufacturer may disseminate information on a new use of a drug only if it meets the specific

requirements set forth in 21 U.S.C. § 360aaa(b). As set forth above in 21 U.S.C. § 360aaa(b),

one of the requirements is that a manufacturer may disseminate written information on a new use

of a drug only if the information is about a clinical investigation with respect to the drug and is

contained in an article published in a scientific or medical journal, which is peer-reviewed by

experts, or in a reference publication. 21 U.S.C. §360aaa-1 states in part:

(a) Authorized information – A manufacturer may disseminate information under section
360aaa of this title on a new use only if the information –

(1) is in the form of an unabridged –

(A) reprint or copy of an article, peer-reviewed by experts qualified by scientific training
or experience to evaluate the safety or effectiveness of the drug or device involved, which
were published in a scientific or medical journal (as defined in section 360aaa-5(5) of this
title), which is about a clinical investigation with respect to the drug or device, and which
would be considered to be scientifically sound by such experts; or
(B) reference publication, described in subsection (b) of this section that includes
information about a clinical investigation with respect to the drug or device that would be
considered to be scientifically sound by experts qualified by scientific training or
experience to evaluate the safety or effectiveness of the drug or device that is the subject
of such a clinical investigation ....

## The Federal and State False Claims Acts

15. The Federal FCA, 31 U.S.C. § 3729(a)(1), makes "knowingly" presenting or

causing to be presented to the United States any false or fraudulent claim for payment, a violation

of federal law for which the United States may recover three times the amount of the damages

the government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim

($5,500 and $11,000 for claims made on or after September 29, 1999).

16. The Federal FCA, 31 U.S.C. § 3729(a)(2), makes "knowingly" making, using, or

causing to be used or made, a false record or statement to get a false or fraudulent claim paid or

approved by the Government, a violation of federal law for which the United States may recover

three times the amount of the damages the Government sustains and a civil monetary penalty of

between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

17.     The Federal FCA, 31 U.S.C. § 3729(a)(3), makes any person, who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

18.     The Federal FCA, 31 U.S.C. § 3729(a)(7), makes it illegal for any person to "knowingly" make, use or cause to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

19.     The Federal FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

20.     As set forth below, several states have passed False Claims Act legislation, which in most instances closely tracks the Federal FCA: California False Claims Act, Cal. Gov't Code § 12650 *et seq.*, Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, §§ 1201 *et seq.*, District of Columbia Procurement Reform Amendment Act, D.C. Code §§ 2-308.13 *et seq.*, Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*, Hawaii False Claims Act, Haw. Rev. Stat.

§§ 661-21 *et seq.*, Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §

175/1 *et seq.*, Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5, Louisiana

Medical Assistance Programs Integrity Law, 46 La. Rev. Stat. c. 3, § 437.1 *et seq.*, Massachusetts

False Claims Act, Mass. Gen. Laws Ch. 12, §§ 5A *et seq.*, Michigan Medicaid False Claims Act,

MI ST Ch. 400, Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq,*, New Hampshire

False Claims Act, N.H. RSA §§ 167:61-b, *et seq.*, New Mexico Medicaid False Claims Act,

2004 New Mexico Laws Ch. 49 (H.B. 468), Tennessee Medicaid False Claims Act, Tenn. Code

Ann. §§ 71-5-181 *et seq.*, Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §§

36.001 *et seq.*, and Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*

These State False Claims Acts apply, *inter alia,* to the state portion of Medicaid fraud losses

caused by false Medicaid claims to the jointly federal-state funded Medicaid program. Each of

the statutes listed above contains *qui tam* provisions governing, *inter alia*, a relator's right to

claim a share of the State's recovery.

## The Medicare and Medicaid Anti-Kickback Act

21.     The Medicare and Medicaid Anti-Kickback Act ("AKA"), 42 U.S.C. § 1320a-7b

(b), makes it illegal to offer, receive, or solicit any remuneration, kickback, bribe, or rebate,

whether directly or indirectly, overtly or covertly, in cash or in kind, to or from any person in

order to induce such person to purchase, lease, or order, or to arrange for or recommend the

purchasing, leasing, or ordering of any good, service, or item for which payment may be made in

whole or in part under a Government Health Care Program. The AKA seeks to prohibit such

activities in order to secure proper medical treatment and referrals, and to limit the possibility of

a patient having to undergo unnecessary treatments or having to accept specific items or services

- 10 -

which are based not on the needs of the patient, but on the incentives given to others, thereby

limiting the patient's right to choose proper medical care and services

## FACTS AND ALLEGATIONS

### The Relators: Allison Kelly and Frank Garcia

22.     Allison Kelly lives in Stamford, Connecticut. She started working for Defendant

Novartis on May 3, 1999 as a sales representative. She was first hired to sell Novartis products

within the Ciba Sales Division (Cardio Vascular Sales: Diovan, Lotrel, Famvir, Lescol) in the

Bronx/Westchester, New York area. She was then promoted to the Respiratory Dermatology

Division (selling Elidel, Ritalin, Focalin, Lamisil). In June 2003, as Xolair was about to be

launched, she was promoted again, this time to the Xolair Sales Force under the Respiratory

Dermatology Division. In that role, she reported first to Frank Garay, then to William Stewart,

and now to an acting manager, Daniel Giunta. The Regional Director for the "Xolair franchise"

is Elizabeth Johnson, who has held that position since August 2005, taking over for her

predecessor, Norbert Stone.

23.     Frank Garcia currently resides in Alice, Texas, having recently moved from

Connecticut. He worked at Defendant Genentech, Inc. in its Respiratory Division from June

2003 through May 2004, as a pharmaceutical sales representative. He reported to a District

Manager, Jerry Kelly, who was responsible for the New York Metropolitan District. The

Regional Manager for the full Northeast Region at that time was Kelli Wilson located in the

Greater Boston (Massachusetts) area.

24.     Ms. Kelly and Mr. Garcia met each other by being assigned by their respective

companies to market the drug Xolair to physicians in the New York area, under a co-marketing

arrangement between Novartis and Genentech. Although employed by different companies, they

- 11 -

often worked together, attended staff meetings and debriefings together, and often received instructions together as part of the joint Novartis/Genentech sales force for the co-marketing of Xolair.

25.     Ms. Kelly and Mr. Garcia both attended the Xolair Launch Meeting for sales representatives, held at the Orlando Florida Ritz Carlton, on or about July 14, 2003. At that time, at several intervals throughout their tenure at the companies, Xolair's approved and unapproved uses were openly discussed. As is typical in the industry, the compensation of the sales force was structured to provide heavy incentives to increase sales, usually performance bonuses based upon the amount of the product sold or distributed. As a result, sales force meetings concerning Xolair focused on how best to increase sales, and frequently strayed from the drug's approved use to certain unapproved uses, as a possible way of boosting sales. As described more fully below, the sales force, under the direction of management, also engaged in improper kickbacks and other illegal activity, in an effort to boost sales.

26.     The first year when Xolair was launched (in mid 2003), the revenue for that year was about $25 million. Since then sales of Xolair have far exceeded goals, and have increased steadily and dramatically, from about $187 million in 2004, to about $320 million in 2005 (70% over goal). A substantial portion of this revenue has been the result of illegal marketing activity. The Defendants' goal for 2006 is officially $410 million, but at the 2006 "kickoff" meeting, representatives were asked to bring in $500 million (referred to by company officials as the "half a billion dollar challenge").

## The Approved Uses of Xolair

27.     Xolair® (Omalizumab) is a recombinant DNA-derived humanized IgG monoclonal antibody that selectively binds to human immunoglobulin E (IgE). Xolair inhibits

- 12 -

the binding of free IgE to the high-affinity receptor FceRI on the surface of the mast cells and basophils. Reduction in surface-bound IgE on FceRI bearing cells limits the degree of release of mediators of the allergic response. Treatment with Xolair also reduces the number of FceRI receptors on basophils in atopic patients. The FDA approved Xolair in June 2003 for – and only for – adults and adolescents (12 years of age and above) with moderate to severe persistent asthma who have a positive rast (blood) or skin test or in vitro reactivity to a perennial aeroallergen *and* whose symptoms are inadequately controlled with inhaled corticosteroids. Xolair has been shown to decrease the incidence of asthma exacerbations in these patients. A true copy of the approved label for Xolair is attached hereto as **Exhibit 1**. Safety and efficacy have *not* been established in other allergic conditions. Xolair is **not approved for and or lacks sufficient efficacy data for**: steroid reduction; atopic dermatitis; other IgE mediated diseases i.e. cerebral palsy, multiple sclerosis, lupus; sinusitis; rhinitis; food allergies; latex allergies; peanut allergies; mild asthma; pediatric patients; patients with IgE levels below 30 or above 700; patients who weigh more than 150 kilograms ("KG") or less than 30 KG; patients who do not test positive to a perennial allergy; patients who are currently controlled on inhaled corticosteroids; improving quality of life; and reducing emergency room visits.

28.     During the clinical trials leading up to the approval of Xolair, there was a significant statistical difference between the Xolair group and the placebo group, with the Xolair group having four times as many malignancies (i.e. cancers) as the placebo group. These issues actually held up FDA approval of the drug by two to three years while the FDA required more information on safety. Other known side effects include immuno-complex disease (serum sickness) and a severe allergic reaction known as anaphylaxis, both of which can be fatal. Genentech at one point also hoped to get Xolair approved for peanut allergy, but that never

- 13 -

happened. If a doctor is hesitant to prescribe Xolair because of the malignancies in the trials, sales representatives are supposed to refer the doctor to the companies' medical affairs or inquiries departments. However, the representatives often address this issue themselves with the doctors. Because the Xolair trials were only conducted on patients who fell in the very narrow criteria for which the drug is now approved, there is no known result for malignancies in other patient populations, i.e., in off-label uses.

29.     Xolair is an injectable drug. It can be administered by a physician or nurse in an inpatient or outpatient setting, or a patient may self inject it. Xolair is very expensive, at a charge of about $548 per vial, and a recommended dosage of 1-3 vials every two weeks for a maximum of 6 vials, treatment can cost as much as about $3,000 per month per patient.

**The Defendants' Detailing of Physicians Concerning Xolair's Unapproved Uses**

30.     While the approved use of Xolair is relatively narrow, its potential (but as yet unapproved) uses are substantial, and have represented untapped and potentially very lucrative markets for Novartis and Genentech. The defendants deliberately detailed physicians on "off-label" uses of Xolair, often orally and sometimes in the form of unpublished abstracts (often financed by the companies themselves), and encouraged their sales forces to get this information before doctors, in order to increase sales. (While physicians are allowed to prescribe medications "off label," it is a violation of the FFDCA for drug companies to market their products "off label," except in narrowly prescribed categories not present here.)

31.     On a routine basis throughout the course of their employment at Novartis and Genentech, Ms. Kelly and Mr. Garcia and others received promotional literature on, and were informed about, Xolair's unapproved uses, and were encouraged to get this information before physicians. The literature and discussions dealt with such potential, but unapproved, uses of

- 14 -

Xolair as: sinusitis, rhinitus, peanut allergy, use in conjunction with rush immunotherapy, and

pediatric applications. These studies were not peer-reviewed, often were scientifically

questionable due to the small sample size of patients, and failed to meet the criteria of the

FFDCA for dissemination of "off-label" data to physicians. Relators have provided specific

examples of this literature to the government in their Disclosure Statement, including abstracts

on Xolair's effects on "acute reactions after rush immunotherapy for ragweed-induced seasonal

allergic rhinitis" (unapproved); pediatric and immunotherapy uses (unapproved); and "effects of

anti-IGE therapy in patients with peanut allergy" (unapproved). By way of further example,

Relator Garcia's manager stressed the importance of noting to allergists the "rush

immunotherapy" educational literature since they would be most hesitant to write Xolair if

traditional allergy shots (immunotherapy) or rush immunotherapy was eliminated or reduced. He

also stressed the importance of the steroid reduction studies to pulmonologists, allergists,

pediatric pulmonologists, pediatric allergists, and pediatricians. Similarly, Relator Kelly has

been given by her employer a "target list" of doctors that includes pediatricians, internists and

family practice doctors, as well as pediatric pulmonologists and pediatric allergists. When Xolair

was launched, the Defendants openly discussed pediatric studies and that there had been children

as young as six in the studies. These practices were company-wide, and nationwide, in scope.

Relators attended sales meetings on a regional and national basis in which these practices were

openly discussed between managers and sales representatives from all parts of the country, and

encouraged. Examples include the Xolair Launch meeting in Orlando, July 2003, the Las Vegas

Xolair meeting in September 2003, the San Diego Xolair "T1" (Trimester 1 covering January-

April of the year) meeting in January 2004, the Dallas T1 meeting in February 2004, and the

Xolair Teleconference Nationwide in February 2005. At these and other meetings, sales

- 15 -

representatives, including Ms. Kelly and Mr. Garcia, were told to absorb this data on unapproved

uses fully, in order to detail physicians with the information and show the "success" Xolair was

having in these unapproved uses.  At several points, there were open discussions about the fact

that the majority of patients on Xolair did not meet the approved indications and eligibility

criteria.

## The Defendants' Illegal Manipulation of Statements of Medical Necessity to Effect Reimbursement for Off-Label/Ineligible Uses and Prescriptions of Xolair

32.     In order to receive reimbursement from a Government Health Insurance Program

for a prescription of Xolair, a physician must complete a Statement of Medical Necessity

("SMN"), indicating, *inter alia*, the patient's condition, that the condition falls within the

approved use of the drug, the dosage prescribed, etc., and submit a claim form such as a CMS

Form 1450 or 1500 in which the doctor, *inter alia,* certifies that the treatment is medically

indicated and covered.  True copies of an SMN, and of CMS Claim Forms (1450 and 1500), are

attached hereto as **Exhibits 2** and **3**, respectively.

33.     Relators know from first-hand knowledge that many Novartis and Genentech

representatives throughout the country fill out the SMNs themselves using patient information

obtained improperly including from patient medical records (in violation of the Health Insurance

Portability and Accountability Act of 1996), in order to facilitate the transaction for the

physicians and increase sales.  In the process, information is often manipulated on the SMN

forms.  For example, many representatives check off maximum dosing to ensure more vials are

used to establish greater sales, many check off that the patient has a perennial allergy when he or

she does not, and many state that the patient has had one of the requisite tests (e.g., rast or skin)

and qualify, when they have and do not. The majority of patients taking Xolair do not in fact fall

within the 30-700 IgE level (as required by the approved label); however, this critical fact is

**routinely** omitted or misrepresented on the SMN forms filled out by the company sales representatives. Having the sales representatives fill out the SMN forms, often with inaccurate and misleading information, substantially distorts the reimbursement process – by making it appear that the prescription falls within the bounds of the approved and covered/eligible use, when it does not.

34.    In addition, sales representatives often encourage physicians that if the patient falls off or outside the dosing chart because they are above the 700 IgE level, the doctor should just prescribe the maximum dosage. This has the effect of boosting sales, but also compromises patient safety. Relators estimate that 75%-95% of all patients on Xolair in fact fall outside the approved 700 IgE range.

35.    Relators also have specific knowledge of improper targeting of pediatric clinics to promote use of Xolair by pediatric allergists. (Pediatric use—i.e. under 12 years of age—of Xolair is unapproved.) Sales representatives would then inaccurately fill out the SMN form to disguise the fact that the patient was under the age (12) of approved use of the drug.

36.    Sales representatives routinely also discuss billing and coding and disseminate information on the same, all in an effort to ensure that the patient claim will be reimbursed regardless of whether the patient is eligible or the drug is covered for that patient.

37.    As noted above, there have been open discussions at meetings of sales representatives and management about the fact that the majority of patients on Xolair do not, in fact, meet the approved indications and eligibility criteria.

**Kickback Activity**

38.    Although federal government and pharmaceutical industry guidelines ("Pharma guidelines") and the rules and interpretations relating to the Anti-Kickback Act are widely known

- 17 -

at Novartis and Genentech, kickback activity is widespread on a national basis and is encouraged by management. This activity includes but is not limited to:

- Speaker honoraria in the range of $1500-$3000, where the physician does not actually have to speak, and where Defendants' speaker guidelines as well as the Pharma guidelines are not followed;

- Extravagant dinners, where the reimbursement slips are falsified to inflate the number of invitees in order to disguise the true cost of the meal;

- Educational grants that are not for valid educational purposes;

- The payment by the defendants of monies to certain physicians to generate clinical studies discussing the off-label, unapproved uses of Xolair, thereby creating the unapproved literature disseminated to or discussed more widely with other physicians;

- Offers to pay for quantities of a physician's book in exchange for a certain number of Xolair prescriptions;

- Company sales representatives performing administrative and billing functions (e.g., spinners to reconstitute the drug, filling out of SMNs, advising on billing and coding, writing medical necessity and appeal letters) appropriate for the doctor's staff, thereby saving the doctor's administrative costs;

- Expensive gifts to certain physicians and office staff, in excess of guidelines;

- "Preceptorships" that are little more than cash incentives;

- Delayed/post dated billing by pharmacy distributors so doctors didn't owe their bills until insurance had reimbursed the doctor; and

- Encouraging doctors to use Xolair in Rush Immunotherapy to gain more patient successes and make more money (rush immunotherapy, unlike traditional long term immunotherapy

- 18 -

which can last several years, involves giving a patient a larger dose of antigen in one injection, but it comes with a higher risk of anaphylactic shock; Xolair was promoted to be given in conjunction with the rush immunotherapy because it supposedly would reduce the risk of anaphylactic shock).

39.     Initially, many doctors did not want to use Xolair because they feared it would affect their bottom line adversely—i.e., by increasing office and administrative costs and threatening the need for the doctors' "bread and butter", namely, immunotherapy and most recently rush immunotherapy.  Sales representatives had to counter this hesitancy at any cost.  As the revenue figures noted above show, they have been very successful.

## Improper Targeting of 340B/Disproportionate Share, Veterans Administration and Other Hospitals/Facilities

40.     When Xolair was launched in mid 2003, the sales representatives who had been hired or assigned to sell it had been told the Medicare and Medicaid approvals were in place. However, it was soon learned that these approvals had not been obtained and the lack thereof would adversely impact the companies' ability to meet revenue targets.  In fact, Genentech had done an effective job of getting Xolair on formularies and influencing thought leaders in the Western part of the United States, but they had not done as good a job in the East.  This adversely impacted regions like New York where Relators were working.  For 2003, Xolair revenue was only about 50% of what had been projected or hoped.  In February 2004, shortly after the end of the 2003 year, both Defendants encouraged their sales representatives in the New York area, including Relators, to target doctors at 340B clinics and DSH and VA hospitals to encourage them to utilize their federal funding for Xolair (see paragraph 11 above).  Relators were at meetings and privy to other discussions where managers instructed and encouraged this targeting, while at the same time stating that the practice was "illegal".  Relators believe this business

- 19 -

strategy then spread across other regions of the companies.

41.     Relators attended a meeting in New York City in early March 2004, attended by the sales representatives for Xolair in the New York region, and Norbert Stone, a Novartis Regional Director, Bill Stewart, Novartis' Manager of the New York Division of Xolair, Jerry Kelly of Genentech (Relator Garcia's immediate boss), and Pilar Carbone, a Novartis hospital sales representative. The Relators and other sales representatives were briefed on the targeted hospitals and told that the plan was an opportunity for the region to "get up there with the rest of the country" on Xolair sales because these hospitals treat a lot of asthmatics. However, Jerry Kelly and Bill Stewart both also told the attendees that what was being proposed was "illegal" and they shouldn't discuss it.

42.     Relators and other sales representatives were given target lists of such hospitals and facilities to contact in their areas. They were under instructions to try to sell Xolair prescriptions in such facilities.

## Damages

43.     The above described practices by Novartis and Genentech have caused the submission of false and fraudulent claims to Government Health Care Programs for reimbursement of Xolair prescriptions. Claims (and SMNs) related to Xolair filed with the Government Health Care Programs have contained false and fraudulent statements and material omissions. Most significantly, Novartis and Genentech have marketed Xolair in a way that has compromised physicians' independent medical judgment and threatened patient safety through use of kickbacks, falsified SMNs/claim forms and off-label promotion.

44.     As noted above, overall revenues for Xolair have totaled some $532 million since it was launched in mid 2003, with another $500 million expected in 2006. Relators are not sure

- 20 -

how much of this revenue is attributable to Government Health Insurance Programs, but they do know that the vast majority of patients who have been prescribed Xolair do not meet indication and/or eligibility criteria. The National Drug Code ("NDC") number for Xolair is 50242-0040-62 (previously the 10 digit version was 50242-040-62).

45.     As required by law, Relators are serving a detailed Disclosure Statement upon the United States and the State parties to this action. The Disclosure Statement provides additional details concerning the Defendants' conduct and Relators' basis of knowledge.

## LEGAL CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATIONS OF THE FEDERAL FCA:  31 U.S.C. § 3729(a)(1) and (2)

46.     Relators restate and reallege the allegations contained in Paragraphs 1-45 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

47.     The Defendants knowingly presented or caused to be presented false or fraudulent claims to Federal Health Care Programs and knowingly made, used or caused to be made or used, false records or statements to get said claims paid by Federal Health Care Programs. Xolair prescriptions for off-label purposes and for ineligible patients would not have been presented but for the unlawful promotional activities made by Defendants, the improper manipulation of SMNs, and the kickback activity. As a result of this illegal activity, these claims were improper in whole pursuant to 31 U.S.C. § 3729(a)(1)-(2).

48.     These claims were also false or fraudulent and the statements and records were false because they were monetarily excessive, in violation of 31 U.S.C. § 3729(a)(1)-(2).

49.     It is illegal to pass the costs of unlawful promotional activities back to any

- 21 -

Federal Health Care Program and it is also illegal to falsely report the true cost of a drug. In addition to violating 31 U.S.C. § 3729(a)(1)-(2), Defendants' conduct violated 31 U.S.C. § 3729(a)(7) as alleged below.

50.     Federal Health Care Programs have been damaged and suffered losses because of the illegal actions by Defendants.

## COUNT TWO

## CONSPIRACY TO DEFRAUD: FEDERAL FCA, 31 U.S.C. § 3729(a)(3)

51.     Relators restate and reallege the allegations contained in Paragraphs 1-50 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

52.     Defendants knowingly conspired to defraud the United States causing increased sales of Xolair through unlawful promotion and other unlawful activities in violation of law. Said actions constitute violations of 31 U.S.C. § 3729(a)(3).

53.     Defendants knowingly conspired to violate the FCA by causing false or fraudulent claims to be presented and to make or use false records or statements to get such claims reimbursed, all of which damaged the Federal Health Care Programs. Said claims were improper and would not have been made but for the unlawful promotional activities, which caused the prescriptions of Xolair to be made. Said claims were also monetarily excessive in cost due to the unlawful promotional activities of the Defendants. Said actions constitute violations of 31 U.S.C. § 3729(a)(3).

54.     The Defendants knowingly conspired to conceal their actions and they failed to alert the state or federal governments of their unlawful promotion of Xolair. It is illegal to pass the costs incurred in unlawful promotional activities back to any Federal Health Care Program

and it is also illegal to falsely report the true cost of a drug. Said actions constitute violations of 31 U.S.C. § 3729(a)(3). Federal Health Care Programs have been damaged and suffered losses because of the illegal actions by Defendants.

**COUNT THREE**

**VIOLATIONS OF THE FEDERAL FCA: 31 U.S.C. § 3729(a)(7)**

55.     Relators restate and reallege the allegations contained in Paragraphs 1-54 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

56.     The Federal FCA, 31 U.S.C. § 3729(a)(7), makes it illegal for any person to "knowingly" make, use or cause to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government, a violation of federal law. Claims to Government Health Care Programs as described above were false or fraudulent and the statements and records were false because they were monetarily excessive.

57.     Defendants' conduct violated 31 U.S.C. § 3729(a)(7), and caused harm and damage to Government Health Care Programs.

**COUNT FOUR**

**VIOLATIONS OF THE CALIFORNIA FCA
Cal. Gov't Code § 12651(a)(1)**

58.     Relators restate and reallege the allegations contained in Paragraphs 1-57 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

59.     The California False Claims Act, Cal. Gov't Code § 12651(a)(1), specifically provides, in part:

(a) Any person who commits any of the following acts shall be liable to the state . . . for

three times the amount of damages which the state . . . sustains because of the act of that

person. A person who commits any of the following acts shall also be liable to the state .

. . for the costs of a civil action brought to recover any of those penalties or damages, and

may be liable to the state . . . for a civil penalty of up to ten thousand ($10,000) for each

false claim:

(1) Knowingly presents or causes to be presented to an officer or employee of the

state . . . a false claim for payment or approval.

60.     Defendants knowingly presented or caused to be presented to the California

Medicaid program false and fraudulent claims for payment and approval, claims which failed to

disclose the material violations of the AKA and other laws, in violation of Cal. Gov't Code §

12651(a)(1).

61.     The State of California paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT FIVE

## VIOLATIONS OF THE CALIFORNIA FCA
## Cal. Gov't Code § 12651(a)(2)

62.     Relators restate and reallege the allegations contained in Paragraphs 1-61 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

63.     The California False Claims Act, Cal. Gov't Code § 12651(a)(2), specifically

provides:

(a) Any person who commits any of the following acts shall be liable to the state . . . for

three times the amount of damages which the state . . . sustains because of the act of that

person. A person who commits any of the following acts shall also be liable to the

- 24 -

state... for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state . . . for a civil penalty of up to ten thousand ($10,000) for each false claim:

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state . . . .

64.     Defendants knowingly made, used and/or caused to be made or used false records and statements to get false and fraudulent claims paid and approved by the California Medicaid program, in violation of Cal. Gov't Code § 12651(a)(2).

65.     The State of California paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SIX

### VIOLATIONS OF THE CALIFORNIA FCA
### Cal. Gov't Code § 12651(a)(3)

66.     Relators restate and reallege the allegations contained in Paragraphs 1-65 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

67.     The California False Claims Act, Cal. Gov't Code § 12651(a)(3), specifically provides:

(a) Any person who commits any of the following acts shall be liable to the state . . . for three times the amount of damages which the state . . . sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the state . . . for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state . . . for a civil penalty of up to ten thousand ($10,000) for each false claim:

(3) Conspires to defraud the state . . . by getting a false claim allowed or paid by the state . . .

68.     Defendants conspired to defraud the State of California by getting false and fraudulent claims allowed and paid, in violation of Cal. Gov't Code § 12651(a)(3).

69.     The State of California paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT SEVEN

### VIOLATIONS OF THE CALIFORNIA FCA
### Cal. Gov't Code § 12651(a)(7)

70.     Relators restate and reallege the allegations contained in Paragraphs 1-69 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

71.     The California False Claims Act, Cal. Gov't Code § 12651(a)(7), specifically provides:

(a) Any person who commits any of the following acts shall be liable to the state . . . for three times the amount of damages which the state . . . sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the state . . . for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state . . . for a civil penalty of up to ten thousand ($10,000) for each false claim:

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state . . . .

- 26 -

72.     Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Cal. Gov't Code § 12651(a)(7).

73.     The State of California paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT EIGHT

## VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
## Del. Code Ann. tit. 6, § 1201(a)(1)

74.     Relators restate and reallege the allegations contained in Paragraphs 1-73 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

75.     The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201(a)(1), specifically provides, in part, that any person who:

(a)(1) Knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval; shall be liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of actual damages which the Government sustains because of the act of that person.

76.     Defendants knowingly presented or caused to be presented, directly and indirectly, to the Delaware Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Del. Code Ann. tit. 6, § 1201(a)(1).

77.     The State of Delaware paid said claims and has sustained damages because of these acts by the Defendants.

- 27 -

## COUNT NINE

## VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
### Del. Code Ann. tit. 6, § 1201(a)(2)

78.     Relators restate and reallege the allegations contained in Paragraphs 1-77 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

79.     The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201(a)(2), specifically provides, in part, that any person who:

(a)(2) Knowingly makes, uses or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved;

shall be liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of actual damages which the Government sustains because of the act of that person.

80.     Defendants knowingly made, used and caused to be made and used, directly and indirectly, false records and statements to get false and fraudulent claims paid and approved by the State of Delaware, in violation of Del. Code Ann. tit. 6, § 1201(a)(2).

81.     The State of Delaware paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TEN

## VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
### Del. Code Ann. tit. 6, § 1201(a)(3)

82.     Relators restate and reallege the allegations contained in Paragraphs 1-81 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

- 28 -

83.     The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §

1201(a)(3), specifically provides, in part, that any person who:

   (a)(3) Conspires to defraud the Government by getting a false or fraudulent claim allowed

   or paid; shall be liable to the Government for a civil penalty of not less than $5,500 and

   not more than $11,000 for each act constituting a violation of this section, plus 3 times

   the amount of actual damages which the Government sustains because of the act of that

   person.

84.     Defendants conspired to defraud the State of Delaware by getting false and

fraudulent claims allowed and paid, in violation of Del. Code Ann. tit. 6, § 1201(a)(3).

85.     The State of Delaware paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT ELEVEN

## VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
## Del. Code Ann. tit. 6, § 1201(a)(7)

86.     Relators restate and reallege the allegations contained in Paragraphs 1-85 above as

if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

87.     The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §

1201(a)(7), specifically provides, in part, that any person who:

   (a)(7) Knowingly makes, uses or causes to be made or used a false record or statement to

   conceal, avoid, increase, or decrease an obligation to pay or transmit money to or from

   the government; shall be liable to the Government for a civil penalty of not less than

   $5,500 and not more than $11,000 for each act constituting a violation of this section,

- 29 -

plus 3 times the amount of actual damages which the Government sustains because of the
act of that person.

88.     Defendants knowingly made, used or caused to be made or used a false record or
statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money
to the state, in violation of Del. Code Ann. tit. 6, § 1201(a)(7).

89.     The State of Delaware paid said claims and has sustained damages because of
these acts by the Defendants.

## COUNT TWELVE

## VIOLATIONS OF THE DISTRICT OF COLUMBIA
## PROCUREMENT REFORM AMENDMENT ACT
## D.C. Code § 2-308.14(a)(1)

90.     Relators restate and reallege the allegations contained in Paragraphs 1-89 above as
if each were stated herein in their entirety and said allegations are incorporated herein by
reference.

91.     The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-
308.14(a)(1), specifically provides, in part:

(a) Any person who commits any of the following acts shall be liable to the District for 3

times the amount of damages which the District sustains because of the act of that person.

A person who commits any of the following acts shall also be liable to the District for the

costs of a civil action brought to recover penalties or damages, and may be liable to the

District for a civil penalty of not less than $5,000, and not more than $10,000, for each

false claim for which the person:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the

District a false claim for payment or approval.

- 30 -

92.     Defendants knowingly caused to be presented to the District of Columbia

Medicaid program false and fraudulent claims for payment and approval, claims which failed to

disclose the material violations of the AKA and other laws, in violation of D.C. Code § 2-

308.14(a)(1).

93.     The District of Columbia paid said claims and has sustained damages because of

these acts by the Defendants.

### COUNT THIRTEEN

### VIOLATIONS OF THE DISTRICT OF THE COLUMBIA
### PROCUREMENT REFORM AMENDMENT ACT
### D.C. Code § 2-308.14(a)(2)

94.     Relators restate and reallege the allegations contained in Paragraphs 1-93 above as if

each were stated herein in their entirety and said allegations are incorporated herein by reference.

95.     The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-

308.14(a)(2), specifically provides, in part:

(a)  Any person who commits any of the following acts shall be liable to the District for 3

times the amount of damages which the District sustains because of the act of that person.

A person who commits any of the following acts shall also be liable to the District for the

costs of a civil action brought to recover penalties or damages, and may be liable to the

District for a civil penalty of not less than $5,000, and not more than $10,000, for each

false claim for which the person:

(2)  Knowingly makes, uses, or causes to be made or used, a false record or statement to

get a false claim paid or approved by the District;

96.     Defendants knowingly made, used and caused to be made and used, directly and

indirectly, false records and statements to get false and fraudulent claims paid and approved by the

- 31 -

District of Columbia, in violation of D.C. Code § 2-308.14(a)(2).

97.     The District of Columbia paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FOURTEEN

## VIOLATIONS OF THE DISTRICT OF THE COLUMBIA PROCUREMENT REFORM AMENDMENT ACT D.C. Code § 2-308.14(a)(3)

98.     Relators restate and reallege the allegations contained in Paragraphs 1-97 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

99.     The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.14(a)(3), specifically provides:

(a) Any person who commits any of the following acts shall be liable to the District for 3 times the amount of damages which the District sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the District for the costs of a civil action brought to recover penalties or damages, and may be liable to the District for a civil penalty of not less than $5,000, and not more than $10,000, for each false claim for which the person:

(3) Conspires to defraud the District by getting a false claim allowed or paid by the District;

100.    Defendants conspired to defraud the District of Columbia by getting false and fraudulent claims allowed and paid, in violation of D.C. Code § 2-308.14(a)(3).

101.    The District of Columbia paid said claims and has sustained damages because of these acts by the Defendants.

- 32 -

## COUNT FIFTEEN

### VIOLATIONS OF THE DISTRICT OF COLUMBIA
### PROCUREMENT REFORM AMENDMENT ACT
### D.C. Code § 2-308.14(a)(7)

102.    Relators restate and reallege the allegations contained in Paragraphs 1-101 above
as if each were stated herein in their entirety and said allegations are incorporated herein by
reference.

103.    The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-
308.14(a)(7), specifically provides, in part:

(a)  Any person who commits any of the following acts shall be liable to the District for 3

times the amount of damages which the District sustains because of the act of that person.

A person who commits any of the following acts shall also be liable to the District for the

costs of a civil action brought to recover penalties or damages, and may be liable to the

District for a civil penalty of not less than $5,000, and not more than $10,000, for each

false claim for which the person:

(7) Knowingly makes, uses or causes to be made or used a false record or statement to

conceal, avoid, increase, or decrease an obligation to pay or transmit money to or from

the government;

104.    Defendants knowingly made, used or caused to be made or used a false record or
statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money
to the state, in violation of D.C. Code § 2-308.14(a)(7).

105.    The District of Columbia paid said claims and has sustained damages because of
these acts by the Defendants.

- 33 -

## COUNT SIXTEEN

### VIOLATIONS OF THE FLORIDA FCA
### Fla. Stat. § 68.082(2)(a)

106.    Relators restate and reallege the allegations contained in Paragraphs 1-105 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

107.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(a), specifically provides, in part, that any person who:

(a) Knowingly presents or causes to be presented to an officer or employee of an agency a false claim for payment or approval; ...is liable to the state for a civil penalty of not less than $5,000 and not more than $10,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

108.    Defendants knowingly presented or caused to be presented to the Florida Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Fla. Stat. § 68.082(2)(a).

109.    The State of Florida paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SEVENTEEN

### VIOLATIONS OF THE FLORIDA FCA
### Fla. Stat. § 68.082(2)(b)

110.    Relators restate and reallege the allegations contained in Paragraphs 1-109 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

111.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(b), specifically provides, in part, that any person who:

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency; ...

is liable to the state for a civil penalty of not less than $5,000 and not more than $10,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

112.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Florida, in violation of Fla. Stat. § 68.082(2)(b).

113.    The State of Florida paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT EIGHTEEN

### VIOLATIONS OF THE FLORIDA FCA
### Fla. Stat. § 68.082(2)(c)

114.    Relators restate and reallege the allegations contained in Paragraphs 1-113 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

115.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(c), specifically provides, in part, that any person who:

(c) Conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid;. . .is liable to the state for a civil penalty of not less than $5,000 and not more than $10,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

116.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Federal/Government Health Care Programs for the purpose of getting

false and fraudulent claims allowed and paid, in violation of Fla. Stat. § 680.82(2)(c).

117.    The State of Florida paid said claims and has sustained damages because of these
acts by the Defendants.

## COUNT NINETEEN

### VIOLATIONS OF THE FLORIDA FCA
### Fla. Stat. § 68.082(2)(g)

118.    Relators restate and reallege the allegations contained in Paragraphs 1-117 above
as if each were stated herein in their entirety and said allegations are incorporated herein by
reference.

119.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(g), specifically provides, in
part, that any person who:

   (g) Knowingly makes, uses or causes to be made or used a false record or statement to

   conceal, avoid, or decrease an obligation to pay or transmit money or property to an

   agency. . .is liable to the state for a civil penalty of not less than $5,000 and not more than

   $10,000 and for treble the amount of damages the agency sustains because of the act or

   omission of that person.

120.    Defendants knowingly made, used or caused to be made or used a false record or
statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money
to the state, in violation of Fla. Stat. § 680.82(2)(g).

121.    The State of Florida paid said claims and has sustained damages because of these
acts by the Defendants.

## COUNT TWENTY

### VIOLATIONS OF THE HAWAII FCA
### Haw. Rev. Stat. § 661-21(a)(1)

122.    Relators restate and reallege the allegations contained in Paragraphs 1-121 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

123.    The Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(1), specifically provides, in part, that any person who:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

. . .

shall be liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages that the State sustains due to the act of that person.

124.    Defendants knowingly presented or caused to be presented to the Hawaii Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Haw. Rev. Stat. § 661-21(a)(1).

125.    The State of Hawaii paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-ONE

### VIOLATIONS OF THE HAWAII FCA
### Haw. Rev. Stat. § 661-21(a)(2)

126.    Relators restate and reallege the allegations contained in Paragraphs 1-125 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

127.    The Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(2), specifically provides, in part, that any person who:

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

. . .

shall be liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages that the State sustains due to the act of that person.

128.    Defendants knowingly made, used and caused to be made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the State of Hawaii, in violation of Haw. Rev. Stat. § 661-21(a)(2).

129.    The State of Hawaii paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-TWO

### VIOLATIONS OF THE HAWAII FCA
### Haw. Rev. Stat. § 661-21(a)(3)

130.    Relators restate and reallege the allegations contained in Paragraphs 1-129 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

131.    The Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(3), specifically provides, in part, that any person who:

(3) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

. . .

shall be liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages that the State sustains due to the act of that person.

132.    Defendants conspired to defraud the State of Hawaii by getting false and fraudulent claims allowed and paid, in violation of Haw. Rev. Stat. § 661-21(a)(3).

133.    The State of Hawaii paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-THREE

### VIOLATIONS OF THE HAWAII FCA
### Haw. Rev. Stat. § 661-21(a)(7)

134.    Relators restate and reallege the allegations contained in Paragraphs 1-133 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

135.    The Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(7), specifically

provides, in part, that any person who:

> (7) Knowingly makes, uses, or causes to be made or used, a false record or statement to
>
> conceal, avoid, or decrease an obligation to pay or transmit money or property to the state.
>
> . . .
>
> shall be liable to the State for a civil penalty of not less than $5,000 and not more than
>
> $10,000, plus three times the amount of damages that the State sustains due to the act of
>
> that person.

136.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Haw. Rev. Stat. § 661-21(a)(7).

137.    The State of Hawaii paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-FOUR

### VIOLATIONS OF THE ILLINOIS
### WHISTLEBLOWERREWARD AND PROTECTION ACT
### 740 Ill. Comp. Stat. § 175/3 (a)(1)

138.    Relators restate and reallege the allegations contained in Paragraphs 1-137 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

139.    The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/3(a)(1), specifically provides, in part, that any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the State
>
> or member of the Guard a false or fraudulent claim for payment or approval;
>
> . . .