# APPENDIX 1
## Xolair False Claims Act-Related Complaints

| Sales and Marketing Practices | *Rediehs v. Genentech, Inc.* (2004) | *Fauci v. Genentech Inc.* (January 11, 2006) | *United States ex rel. Kelly & Garcia v. Novartis AG, et al.* (2006) | *United States ex rel. Fauci v. Genentech, et al.* (2010) | *United States ex rel. Kelly v. Novartis, et al.* (2012) |
|---|---|---|---|---|---|
| **Summary of Allegations** | "Genentech was engaged in a variety of illegal marketing practices, including promoting Xolair for off-label indications, instructing physicians to use unauthorized procedure codes, and payment of 'honoraria' to physicians who purchased Xolair." Compl. ¶ 35. | "Fauci soon discovered that many of Genentech's Xolair sales representatives were engaged in illegal and wrongful [sales and marketing] practices explicitly and implicitly encouraged by Genentech's managers to increase sales of Xolair . . . , as well as increase Genentech's profits." Compl. ¶ 17. | The Defendants in this case . . . engage[d] in numerous unlawful activities in their co-marketing of the drug Xolair . . ." Compl. at 2. | "Relator discovered that to reach their sales goals, many Xolair sales representatives were involved in illegal and wrongful [sales and marketing] practices." Compl. ¶ 110. | Defendants "aggressively and illegally market[ed] Xolair . . . ." Compl. ¶ 12. |
| **Off-label Promotion** | Rediehs was encouraged "to discuss with physicians 'anything [he] want[ed]' about Xolair to induce a sale . . . ." Compl. ¶ 15.<br><br>Sales representatives advised physicians that "Xolair could benefit not only patients who suffer from allergic asthma, but also could be effective for 'the entire allergic cascade,' | | Disguised the fact that patients were under 12 years old.  Compl. ¶ 35.<br><br>"The defendants deliberately detailed physicians on 'off-label' uses of Xolair, often orally and sometimes in the form of unpublished abstracts (often financed by the companies themselves), and encouraged their sales forces to get this | "Defendants instructed their sales representatives to promote illegal uses of Xolair to their prescribing physician customers by marketing Xolair for treatment of all types of asthma, not just moderate to severe asthma, as the approved indication stated." Compl. ¶ 111.<br><br>Sales representatives | Disguised the fact that patients were under 12 years old.  Compl. ¶ 276.<br><br>"The sales practices that Defendants' management directed sales representatives to utilize . . . illegally promoted the 'off-label' use of Xolair." *Id.* ¶ 218.<br><br>"Defendants' sales |

1

| Sales and Marketing Practices | *Rediehs v. Genentech, Inc.* (2004) | *Fauci v. Genentech Inc.* (January 11, 2006) | *United States ex rel. Kelly & Garcia v. Novartis AG, et al.* (2006) | *United States ex rel. Fauci v. Genentech, et al.* (2010) | *United States ex rel. Kelly v. Novartis, et al.* (2012) |
|---|---|---|---|---|---|
| **Off-label Promotion** | including sinusitis and allergic rhinitis, as well as to decrease antibiotic utilization, and to improve the effects of immunotherapy." *Id.* ¶ 17.<br><br>Xolair was promoted "as an effective drug for the 'entire allergic cascade,' including improving positive outcomes of immunotherapy." *Id.* ¶ 18. | | information before doctors, in order to increase sales." *Id.* ¶ 30.<br><br>"Ms. Kelly and Mr. Garcia and others received promotional literature on, and were informed about, Xolair's unapproved uses, and were encouraged to get this information before physicians. The literature and discussions dealt with such potential, but unapproved, uses of Xolair as: sinusitis, rhinitus [sic], peanut allergy, use in conjunction with rush immunotherapy, and pediatric applications." *Id.* ¶ 31. | were instructed to use the term "active asthma" in place of "moderate to severe asthma," *id.* ¶ 112, and misrepresented the importance of IgE levels, *id.* ¶ 119.<br><br>"The marketing of Xolair for mild asthma, contrary to the indication and use approved by the FDA, constituted misbranding of the drug." *Id.* ¶ 117. | representatives . . . were encouraged to get [off-label promotional literature] before physicians. The literature and discussions dealt with such potential, but unapproved, uses of Xolair as: sinusitis, rhinitis, peanut allergy, use in conjunction with rush immunotherapy, and pediatric applications." *Id.* ¶ 231.<br><br>"Defendants never directed the Xolair sales force to draw any distinction between 'mild' or 'active' asthma and 'moderate to severe asthma'." *Id.* ¶ 205.<br><br>Distribution of medical literature promoting off-label uses of Xolair, including unapproved clinical studies, and unpublished abstracts, including for sinusitis, |

| Sales and Marketing Practices | *Rediehs v. Genentech, Inc.* (2004) | *Fauci v. Genentech Inc.* (January 11, 2006) | *United States ex rel. Kelly & Garcia v. Novartis AG, et al.* (2006) | *United States ex rel. Fauci v. Genentech, et al.* (2010) | *United States ex rel. Kelly v. Novartis, et al.* (2012) |
|---|---|---|---|---|---|
| | | | | | rhinitis, peanut allergy, use in connection with rush immunotherapy and pediatric applications. *Id.* ¶¶ 201, 228, 230-31. |
| **Improper Involvement with Statements of Medical Necessity ("SMN" Forms)** | | "Another practice widely encouraged by Genentech was sales representatives' review of confidential patient records to complete Genentech's 'Statement of Medical Necessity' forms. . . . Completion of these forms by Genentech's sales representatives unlawfully expedited increased sales of Xolair." Compl. ¶ 19.<br><br>"As Genentech's in-house counsel later confirmed for Fauci, Genentech's sales representatives' review of patient files and completion of the forms is unlawful." *Id.*<br><br>Fauci was required to | Sales representatives often manipulated information on the SMN forms, including: checking off the maximum dose "to establish greater sales," checking that the patient has a perennial allergy when he or she did not, stating that the patient had taken one of the required tests to qualify for Xolair when they had not, and misrepresenting the patient's age if they were under the approved age for Xolair administration. Compl. ¶¶ 33, 35.<br><br>"Having the sales representatives fill out the SMN forms, often with inaccurate and | "Genentech and Novartis further instructed their sales representatives to fill out the SMNs for physicians and, when so doing, to place false information therein, such as increased body weight to increase the dosage, and thereby increase the sales, of Xolair . . . ." Compl. ¶ 121. | "Many Novartis and Genentech representatives throughout the country fill out the SMNs themselves . . . in order to facilitate the transaction for the physicians and to increase sales." Compl. ¶ 273.<br><br>Patients' IgE levels were "routinely omitted or misrepresented on the SMN forms filled out by the company sales representatives." Compl. ¶ 275.<br><br>Defendants instructed sales representatives, when necessary, to achieve "'pull through' (consummation of the sale or prescription), to |

3

| Sales and Marketing Practices | *Rediehs v. Genentech, Inc.* (2004) | *Fauci v. Genentech Inc.* (January 11, 2006) | *United States ex rel. Kelly & Garcia v. Novartis AG, et al.* (2006) | *United States ex rel. Fauci v. Genentech, et al.* (2010) | *United States ex rel. Kelly v. Novartis, et al.* (2012) |
|---|---|---|---|---|---|
| **Improper Involvement with Statements of Medical Necessity ("SMN") Forms)** | | attend a "good practices workshop," in which a Genentech sales representative, discussed in detail her extensive efforts to personally fill out patient SMNs. *Id.* ¶ 38. | misleading information, substantially distorts the reimbursement process - by making it appear that the prescription falls within the bounds of the approved and covered/eligible use, when it does not." *Id.* ¶ 33.<br><br>Sales representatives "throughout the country fill out the SMNs themselves . . . in order to facilitate the transaction for the physicians and increase sales." *Id.* ¶ 33. | | fill out the SMNs for physicians, and when doing so, to place false information therein, such as increased body weight to increase the dosage, and thereby increase the sales of, Xolair . . . ." *Id.* ¶ 215. |
| **Improper Payments/ Kickbacks** | One physician was offered "a pulmonary function machine and . . . other area physicians [were provided] with similarly inappropriate 'honoraria,' such as refrigerators, advertising, cameras, and computers, implying that such | "Sullivan angrily reprimanded Fauci for Fauci's refusal to approve a 'honoraria' payment to a local physician, who also happened to be Pino's friend and neighbor, on grounds that such payments were improper." Compl. | "[T]he sales force, under the direction from management, also engaged in improper kickbacks and other illegal activity, in an effort to boost sales." Compl. ¶ 25.<br><br>"[K]ickback activity is widespread on a national basis and is | | "Defendants have provided a variety of expensive equipment to HCPs to induce them to administer Xolair," including refrigerators, as well as "honoraria of $1,000.00 to $3,000.00 . . . ." Compl. ¶ 18.<br><br>Medical and office |

4

| Sales and Marketing Practices | *Rediehs v. Genentech, Inc.* (2004) | *Fauci v. Genentech Inc.* (January 11, 2006) | *United States ex rel. Kelly & Garcia v. Novartis AG, et al.* (2006) | *United States ex rel. Fauci v. Genentech, et al.* (2010) | *United States ex rel. Kelly v. Novartis, et al.* (2012) |
|---|---|---|---|---|---|
| **Improper Payments/ Kickbacks** | honoraria would be forthcoming if such physicians placed orders with Genentech for Xolair." Compl. ¶ 24.<br><br>Physicians were offered "a $15,000-$20,000 'honorarium' to fund advertising for the [Board Certified Allergists]." *Id.* ¶ 25.<br><br>A physician was offered "a $25,000 'honorarium' that would purportedly include the purchase of a computer to track patients who used Xolair." *Id.* ¶ 26. | ¶ 47. | encouraged by management." *Id.* ¶ 38.<br><br>Among these alleged kickbacks were: speaker honoraria in the range of $1500-3000, extravagant dinners, educational grants that are not for valid educational purposes, payments to generate clinical studies discussing off-label use, payments for physician's books, Xolair sales representatives performing administrative and billing functions, expensive gifts, and "preceptorships" that are little more than cash incentives, delayed/post-dated billing by pharmacy distributors. *Id.* | | equipment was provided to induce HCPs to administer Xolair, *e.g.*, swirlers/spinners, pulmonary function machines (to test for asthma), refrigerators, IgE test kits (to test for asthma), and computers (to register and track asthma patients). *Id.* ¶ 257.<br><br>Speakers were provided lucrative inducements in exchange for off-label use and promotion of Xolair, frequently being paid in the tens of thousands of dollars per year. *Id.* ¶ 255.<br><br>"$500.00-$1,000.00 payments to physicians for 'preceptorships' (allowing sales representatives and/or managers to tag along . . . when asthma patients were being seen by physicians). *Id.* |

| Sales and Marketing Practices | *Rediehs v. Genentech, Inc.* (2004) | *Fauci v. Genentech Inc.* (January 11, 2006) | *United States ex rel. Kelly & Garcia v. Novartis AG, et al.* (2006) | *United States ex rel. Fauci v. Genentech, et al.* (2010) | *United States ex rel. Kelly v. Novartis, et al.* (2012) |
|---|---|---|---|---|---|
| | | | | | ¶ 257. |
| **Improper Billing Practices** | Genentech "provided instructions to the sales team regarding how to teach physicians to manipulate the coding and billing process to obtain a higher rate of reimbursement for Xolair from Medicare." Compl. ¶ 14.<br><br>One health center was advised "to take advantage of its 340B discount (for hospitals that provide a certain percentage of their services to Public Aid patients) and then bill Medicare at inflated rates." *Id.* ¶ 16.<br><br>Sales representatives advised physicians that they "could obtain a greater rate of reimbursement for Xolair from Medicare and private insurers by | "[M]anipulating coding and billing processes to obtain higher rates of reimbursement for Xolair by Medicare." Compl. ¶ 21.<br><br>"For example, Fauci's managers, including Sullivan, Wilson, and Mastrianni, directed Xolair sales representatives to instruct physicians to use Medicare's code 95199, a non-specific allergy code, and other codes in their Xolair billing to Medicare to obtain a higher government reimbursement." *Id.*<br><br>"Genentech's Xolair sales representatives instructed prescribing physicians on the wrongful use of | "Having the sales representatives fill out the SMN forms, often with inaccurate and misleading information, substantially distorts the reimbursement process - by making it appear that the prescription falls within the bounds of the approved and covered/eligible use, when it does not." Compl. ¶ 33.<br><br>"Sales representatives routinely also discuss billing and coding and disseminate information on the same, all in an effort to ensure that the patient claim will be reimbursed regardless of whether the patient is eligible or the drug is covered for that patient." *Id.* ¶ 36.<br><br>Sales representatives | | "[A]dvising HCPs to bill for patient levels 4-5 when patient levels 1-2 were proper" and "to use improper CPT codes, especially CPT code 96401, to seek Government Healthcare Program reimbursement for the administration of Xolair." Compl. ¶¶ 281, 285.<br><br>"Sales representatives routinely also discuss billing and coding and disseminate information on the same, all in an effort to ensure that the patient claim will be reimbursed regardless of whether the patient is eligible or the drug is covered for that patient." *Id.* ¶ 276.<br><br>Defendants improperly instructed HCPs to use other CPT codes for |

6

| Sales and Marketing Practices | *Rediehs v. Genentech, Inc.* (2004) | *Fauci v. Genentech Inc.* (January 11, 2006) | *United States ex rel. Kelly & Garcia v. Novartis AG, et al.* (2006) | *United States ex rel. Fauci v. Genentech, et al.* (2010) | *United States ex rel. Kelly v. Novartis, et al.* (2012) |
|---|---|---|---|---|---|
| **Improper Billing Practices** | using Medicare code 95199, a non-specific allergy code . . . ." *Id.* ¶ 19.<br><br>"As part of Genentech's campaign to increase Xolair sales, [physicians were instructed] to use Medicare procedure code 95199 to obtain a rate of reimbursement of $85-$150 for Xolair; significantly higher than the customary reimbursement amount." *Id.* ¶ 22. | Medicare billing codes as a means to induce physicians to prescribe Xolair for their patients . . . ." *Id.*<br><br>"Using 'marketing the spread' tactics, sales representatives induced physicians to prescribe Xolair to Medicare and Medicaid patients by showing them how to profit from reimbursement payments . . . ." *Id.* ¶ 18.<br><br>"[A] Genentech sales representative would present to the physician a scenario by which the physician would profit from the 'spread' or difference in what the physician paid Genentech's Specialty Pharmacy for Xolair and the higher amount billed to the United States government for Xolair." *Id.* ¶ 18. | were encouraged to target doctors at 340B clinics and disproportionate share and VA hospitals "to encourage them to utilize their federal funding for Xolair." *Id.* ¶ 40. | | Xolair administration, including 95115, 95117, and 95199, which were for inapplicable allergen immunotherapy. *Id.* ¶ 289.<br><br>A Novartis Business Accounts Manager authored an email reflecting Defendants' marketing to physicians of the use of specific CPT codes for administration of Xolair. *Id.* ¶ 290.<br><br>"Defendants' sales representatives were also directed by Defendants' management to 'market the spread' in general to HCPs (not just to DSHs)—the difference between the acquisition price of Xolair and the reimbursement rates provided by Medicare, Medicaid, and other government health care programs." *Id.* ¶ 297. |