# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES W. REDIEHS, an individual, | ) | |
| Plaintiff, | ) | |
| | ) | No. 04C |
| vs. | ) | |
| | ) | |
| GENENTECH, INC., a Delaware corporation, | ) | JURY DEMAND |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff James W. Rediehs ("Rediehs") states as follows as his complaint against Genentech, Inc. ("Genentech"):

### Introduction

1. This is an action under the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h) (the "Act"), and Illinois common law. In violation of the Act, Genentech retaliated against Rediehs, a Clinical Specialist recruited by Genentech and a leader in his territory in sales, after he confronted Genentech with its off-label marketing practices and other illegal marketing strategies. Genentech terminated Rediehs' employment in retaliation for his protected activities. Rediehs had devoted significant time and effort in order to cultivate relationships with physicians for the benefit of Genentech and with the anticipation of significant upside, only for Genentech to unilaterally terminate his employment and deprive him of substantial commissions and the promotion that had been promised to him, all in breach of his employment agreement.

### Parties

2.  Rediehs lives in Naperville, Illinois. He has spent his entire professional career in pharmaceutical sales. Genentech recruited Rediehs in 2003 because of his impressive background, relationships, and track record for generating pharmaceutical sales in new markets. Throughout his employment with Genentech, Rediehs was based in his home office in Naperville, Illinois.

3.  Genentech is a Delaware corporation with its principal place of business in South San Francisco, California. Genentech operates an office in Crystal Lake, Illinois and regularly transacts business in Illinois.

### Jurisdiction and Venue

4.  This Court has original jurisdiction over Count I (Retaliation under the False Claims Act, 31 U.S.C. § 3729 *et seq.*) pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Count II pursuant to 28 U.S.C. § 1367.

5.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as Genentech resides in this district, and a substantial part of the events giving rise to Rediehs' claims occurred in this district.

### Allegations Common to All Counts

6.  Rediehs is a graduate of the University of Tennessee-Knoxville, having received his Bachelor of Science in 1989. Following graduation, he spent two years as a sales professional at UAD Pharmaceuticals and facilitated his employer's entrée into the Chicago pharmaceutical market. He was then recruited by Schering-Plough Corporation ("Schering"), where he initially served as a sales professional, receiving an award for Rookie of the Year, two

awards for District Representative of the Year, as well as two President's Cups (awarded to sales teams that received the highest sales results nationwide).

7. Rediehs was subsequently promoted to district account representative at Schering. In that role, he received Schering's most prestigious award, the "Zero Order Award," which recognized him for having achieved the highest 2% of Schering's sales and demonstrated leadership skills and integrity, all consistently over a 5-year period. Schering then selected him as one of only twelve professionals nationwide to serve on a task force developed to partner, drive formulary access, and implement value-added programs with fourteen (14) medical groups in the Chicago Metropolitan Market. He was quickly promoted to Managed Care Account Manager, in which role he negotiated product service contracts and achieved formulary access for a variety of Schering products, including Peg-Intron injectible, Claritin, and Zetia. He received a 2000 runner-up award for Rookie of the Year in Managed Care and in 2003 achieved performance rankings of #3 in his region and #4 in the nation. During the course of his career at Schering, his total compensation increased from $70,000 at the inception of his employment to $240,000 in his final position with Schering.

8. Having learned of Rediehs' impressive background, relationships, and track record for generating sales in new markets, Genentech recruited him in early 2003 to serve as a clinical specialist and lead Genentech in developing a Chicago presence for the launch of its new asthma drug, Xolair.

9. To entice Rediehs to accept its offer of employment as a Clinical Specialist, Genentech's District Manager, Cecile Henault Coumbe ("Coumbe"), verbally promised him that he would be promoted to a Managed Care Account Manager within one year. In reliance upon

3

that representation, Rediehs accepted Genentech's offer and commenced employment in mid-March 2003, declining a District Manager position that Schering had offered to him.

10.   Shortly after his employment with Genentech began, Rediehs was ranked #2 in the nation for "Unique Physician" implementation and #1 in his region for "Pulmonary Depth." These rankings demonstrated Rediehs' prowess in sales, as the number of Xolair prescriptions written by physicians on whom he called quickly grew. Rediehs consistently was a leader in his district in sales and demonstrated his dedication to Genentech and the growth of the Xolair market.

11.   On January 22, 2004, Coumbe commended Rediehs for his "[g]reat follow up!" regarding a critical meeting with one of Genentech's customer physicians. She thanked Rediehs for "all of [his] efforts and perseverance to a potentially great outcome."

12.   On February 13, 2004, Coumbe praised Rediehs for having mended a failing relationship between Genentech and the University of Illinois, Chicago ("UIC"): "Wow, what a great day. . .I almost gave you a high five! Your relationship with John Gargos was able to get us back into his office [and] handle some of his objections. The meeting secured Xolair stocking at UIC."

13.   During Rediehs' annual performance review in early April 2004, his superiors lauded him for demonstrating an "ability to build strong customer relationships," for having "leveraged [his] relationships and implemented some innovated programs during [the] launch [of Xolair]," and for his "strategic agility." According to his superiors, his "Relator strength secured [him] an honorary membership with the [Illinois Society of Allergy, Asthma & Immunology] society. This is quite impressive!" He is "an incredible liaison to get people together and arrange meetings." He exhibited "exceptional strength" in providing timely information and

communication, and "solid performance" in communicating clearly, teamwork and collaboration, sound analysis and decision making, process improvements, diversity, ownership and accountability, and leadership.

### Genentech's Illegal Marketing Practices and Rediehs' Opposition to Such Practices

14. In January 2004, Genentech published and distributed to its sales team a summary entitled "Medicare Reimbursement for Xolair." This summary provided instructions to the sales team regarding how to teach physicians to manipulate the coding and billing process to obtain a higher rate of reimbursement for Xolair from Medicare. Throughout Rediehs' employment, Genentech regularly directed its sales team, informally and at training seminars, to overcome physicians' concerns about potentially low reimbursement rates for Xolair from Medicare and private insurers by providing instruction regarding billing and coding techniques.

15. On or about February 5, 2004, Coumbe urged Rediehs to obtain as much information as he could find about Xolair from UIC and University of Chicago libraries so that he could talk to physicians "at their level." When Rediehs said he would only discuss science and present physicians with articles that had been approved by Genentech's corporate headquarters, Coumbe encouraged him to discuss with physicians "anything [he] want[ed]" about Xolair to induce a sale, as long as he did not leave anything behind.

16. That same day, Coumbe instructed Rediehs to tell UIC's purchasing director, John Gargas, to take advantage of its 340B discount (for hospitals that provide a certain percentage of their services to Public Aid patients) and then bill Medicare at inflated rates. When Rediehs told Coumbe that he believed such a practice would be illegal, she replied that he should "leave it up to the customer" whether to follow her recommendation.

5

17. On or about February 5, 2004, Rediehs and Coumbe also met with Dr. John Latall, a UIC allergist. Coumbe advised Dr. Latall that Xolair could benefit not only patients who suffer from allergic asthma, but also could be effective for "the entire allergic cascade," including sinusitis and allergic rhinitis, as well as to decrease antibiotic utilization, and to improve the effects of immunotherapy. Rediehs was concerned about these representations, as he knew that the Federal Food and Drug Administration ("FDA") had not approved Xolair for these indications. (According to Genentech's own Web site, the sole indication for which Xolair has been approved by the FDA is the "treatment of moderate-to-severe persistent asthma.") At a later meeting, Dr. Latall asked Rediehs for documentation supporting Coumbe's representations. As no such documentation existed, Rediehs' discomfort with Genentech's questionable marketing practices grew.

18. On or about February 20, 2004, Rediehs, Genentech's national speaker, Bob Lanier ("Lanier"), and senior clinical specialist, Charles Sherline ("Sherline"), met with Dr. David Knysak, an allergist from Oak Brook, Illinois. Like Coumbe, Lanier promoted Xolair as an effective drug for the "entire allergic cascade," including improving positive outcomes of immunotherapy.

19. Sherline also advised Dr. Knysak that he could obtain a greater rate of reimbursement for Xolair from Medicare and private insurers by using Medicare code 95199, a non-specific allergy code, and provided Dr. Knysak with a handwritten summary of the specific rate of reimbursement he could expect to receive if he used this and other billing codes. During a follow-up meeting with Sherline and Coumbe, Rediehs expressed alarm that marketing Xolair for off-label uses and instructing physicians to use codes that had not been approved by the Joint Council on Allergy, Asthma and Immunology ("JCAAI") was inappropriate.

20. On or about March 31, 2004, at the request of Dr. Knysak, Rediehs arranged a meeting with Genentech's Regional Director, Greg Pahanish ("Pahanish"). At the meeting, Dr. Knysak, the former President of the Illinois Society of Allergy, Asthma and Immunology, conveyed his and Rediehs' concerns regarding Genentech's off-label marketing practices and advice to physicians regarding unauthorized billing codes. Rediehs later told Pahanish that he did not feel comfortable instructing physicians to use unauthorized codes and would not engage in such illegal marketing practices. Pahanish frowned and abruptly ended the conversation.

21. On or about June 9, 2004, Genentech's Regional Scientific Director, Sandy DeSalvo ("DeSalvo"), along with Pahanish and Coumbe, led a presentation for the entire regional sales force regarding how to teach physicians to manipulate the coding and billing process to obtain a higher rate of reimbursement for Xolair from Medicare and private insurers. Coumbe urged the regional sales force to utilize DeSalvo as an important resource in assisting physicians to overcome billing objections.

22. On or about July 14, 2004, DeSalvo met with Rediehs and Dr. Knysak's billing administrator, Karen Nelson. As part of Genentech's campaign to increase Xolair sales, DeSalvo instructed Ms. Nelson to use Medicare procedure code 95199 to obtain a rate of reimbursement of $85-$150 for Xolair, significantly higher than the customary reimbursement amount. DeSalvo also provided Ms. Nelson with a billing protocol which contained instructions for physicians regarding the use of certain procedure codes to overcome reimbursement denials for Xolair. The following day, DeSalvo provided the same instructions to Dr. Knysak.

23. Dr. Knysak, reasonably believing that DeSalvo's instructions comported with insurance carriers' directives, used the codes DeSalvo recommended. As a result, Rediehs understands that Dr. Knysak's office is currently under investigation by Blue Cross/Blue Shield.

Dr. Knysak later expressed concern to Rediehs that DeSalvo's instructions were inappropriate, as use of the prescribed codes were not authorized by JCAAI.

24. Dr. Knysak also related to Rediehs that Sherline had offered to provide him with a pulmonary function machine and to provide other area physicians with similarly inappropriate "honoraria," such as refrigerators, advertising, cameras, and computers, implying that such honoraria would be forthcoming if such physicians placed orders with Genentech for Xolair. Rediehs relayed these concerns to Sherline and suggested to Sherline (who has a close relationship with Coumbe) that he discontinue such illegal marketing practices.

25. In or about mid-July 2004, during a meeting attended by Coumbe, Sherline, Rediehs, and Board Certified Allergists ("BCA") members, Dr. Knysak and Dr. Joe Leija, Sherline offered to provide a $15,000-$20,000 "honorarium" to fund advertising for the BCA as part of its effort to rebuild. After the meeting, Rediehs voiced concern and skepticism to Coumbe and Sherline as to whether such an arrangement was lawful.

26. On or about August 11, 2004, Sherline led a conference call with Rediehs and the Vice President of Advocate Health Systems, Dr. Scott Sarran. During the call, Sherline offered Dr. Sarran a $25,000 "honorarium" that would purportedly include the purchase of a computer to track patients who used Xolair. Rediehs implored Sherline to be careful about offering money to physicians to purchase office equipment.

### Genentech's Retaliation Against Rediehs

27. As Rediehs voiced his concerns, he began receiving one signal after another from his Genentech supervisors that his whistleblowing activities would not be tolerated. First, on or about April 20, 2004 (just a couple weeks after his positive performance review), Coumbe advised Rediehs, in words or substance, that he would be "happier at another organization" and

that he "did not fit into Genentech." When he reminded her of her promise to promote him to Managed Care Account Manager, she told him, for the first time, that she would not support such a move.

28.   On or about May 6, 2004, during a field visit with Rediehs, Coumbe instructed him to either leave Genentech voluntarily or be placed on an onerous performance improvement plan ("PIP"). On or about May 27, 2004, Coumbe terminated Rediehs' assignment to his largest account, UIC. Rediehs was not credited for the 40 vials of Xolair purchased by UIC and never received commissions on such sale.

29.   Genentech followed through on its threat on or about July 19, 2004 and implemented a 60-day PIP that required Rediehs to provide to Coumbe detailed weekly accounts of his objectives and goals, detailed accounts of whether such goals were attained and, if not, detailed strategies to attain them the following week. Coumbe subsequently increased the PIP's intensity by mandating that Rediehs provide such detailed accounts on a daily basis.

30.   Complying with the PIP's reporting requirements occupied all of Rediehs' working time and interfered with his sales efforts. Importantly, the PIP demanded that Rediehs "[h]ave the intellectual horsepower to discuss the reimbursement process. . . [but] [d]o not email or leave unapproved literature behind."

31.   To further discredit Rediehs, Coumbe also prepared inaccurate reports of Rediehs' field visits, including a report following his mid-July field visit to Dr. Rene Lantner, in which she questioned his knowledge of Xolair's science.

32.   At about the time Genentech's retaliatory acts began, Rediehs' performance was exemplary. His sales figures were increasing and he was quickly cultivating relationships with physicians throughout his region.

33. On or about August 3, 2004, Coumbe advised Rediehs that even if he successfully emerged from the PIP, he would not be considered for a managed care position for many years. Ten days later, only thirty (30) days into the PIP and before he had been given a reasonable opportunity to fulfill its requirements, Coumbe contacted Rediehs and told him that a separation agreement was being sent to him and that he had no choice but to agree to its terms, sign it, and return it to Genentech within five (5) days.

34. When Rediehs suggested to Coumbe that Genentech's motive for his termination stemmed from his complaints regarding Genentech's illegal marketing practices, Coumbe simply recited the terms of the separation agreement and reiterated that he needed to sign the agreement. Rediehs, naturally believing his employment had been terminated, took no additional steps to comply with the PIP.

35. Later, Rediehs received a telephone call from Genentech's Human Resources Manager, Ron Morgan ("Morgan"), who inquired about Rediehs' discussion with Coumbe earlier that day. Rediehs advised Morgan of Coumbe's instructions concerning the separation agreement. He also conveyed to Morgan that Genentech was engaged in a variety of illegal marketing practices, including promoting Xolair for off-label indications, instructing physicians to use unauthorized procedure codes, and payment of "honoraria" to physicians who purchased Xolair. Morgan replied only that despite Coumbe's directive, Rediehs was not obligated to sign the separation agreement. The following day, Rediehs sent Morgan an e-mail imploring Genentech to reconsider its decision to terminate his employment.

36. On or about August 19, 2004, Coumbe called Rediehs and offered to allow him to complete the term of the PIP. Rediehs expressed surprise, as he was of the impression that his employment already had been terminated. He also expressed skepticism that even if he were

reinstated for the remainder of the term of the PIP, Genentech would not evaluate him fairly. As he had with Morgan, Rediehs advised Coumbe that there were far bigger issues at play that led Genentech to take adverse employment actions against him.

37.     Rediehs was soon summoned to a meeting on September 2, 2004 in Dallas, Texas with Coumbe and Pahanish. At Pahanish's request, Rediehs reiterated his concerns about Genentech's illegal marketing practices. Specifically, he mentioned Genentech's instructions to physicians to use improper billing codes in an effort to increase reimbursement by Medicare and private insurers, as well as Genentech's marketing of Xolair for off-label indications such as sinusitis, allergic rhinitis, and use with immunotherapy, and Genentech's practices of providing "honoraria" to physicians as incentive to purchase Xolair. Coumbe specifically admitted that Genentech's "ethics" were "not in-line with the mainstream."

38.     Following the discussion, Pahanish advised Rediehs that if a position in Genentech's managed care division became available, Pahanish would recommend Rediehs. Pahanish also promised Rediehs that going forward, he would report to someone other than Coumbe. Rediehs left the meeting feeling encouraged that perhaps Genentech intended to cease its illegal marketing practices and to reconsider its decision to terminate his employment.

39.     Instead, less than two (2) weeks later, Rediehs was summoned to San Francisco for a meeting on September 15, 2004 with Coumbe, Pahanish, and Morgan. There, Genentech's termination of his employment became final.

## COUNT I

### (Retaliation Under the False Claims Act, 31 U.S.C. § 3729 *et seq.*)

40.     Rediehs restates and incorporates by reference the allegations of Paragraphs 1 through 39.

11

41.     Rediehs discovered Genentech's illegal marketing practices, opposed such activities and attempted to thwart them.

42.     Rediehs' activities, as described above, are protected activities under the False Claims Act, 31 U.S.C. § 3729 *et seq.*(the "Act").

43.     Genentech had knowledge that Rediehs was engaged in such protected activities.

44.     As a result of and in response to Rediehs' protected activities, Genentech terminated his relationship with his largest account, failed to pay commissions to which he is entitled, denied him the promotion promised to him when he was hired, imposed an onerous performance improvement plan, and ultimately terminated his employment.

45.     Genentech's retaliation against Rediehs violates Section 3730(h) of the Act.

Wherefore, Plaintiff James W. Rediehs respectfully requests entry of judgment in his favor and against Defendant Genentech, Inc. in an amount to be determined at trial as follows:

(a)     two times backpay;

(b)     interest on backpay, at the prime rate, compounded annually;

(c)     front pay;

(d)     compensatory damages for emotional distress and damage to reputation;

(e)     reasonable attorneys' fees and costs; and

(f)     such further relief as this Court deems equitable and just.

## COUNT II

### (Breach of Contract)

46.     Rediehs restates and incorporates by reference the allegations of Paragraphs 1 through 45.

47.   Rediehs and Genentech entered into an oral employment agreement whereby Genentech would pay Rediehs an annual base salary of $80,000 (subsequently increased to $81,000) and incentive compensation in the form of commissions (projected to be between $40,000-$80,000 annually) computed based on sales procured by him in excess of specified quotas, and to promote him to a managed care position within one year of his commencement of employment (the "Employment Agreement").

48.   Rediehs performed all obligations required of him under the Employment Agreement and exceeded his sales quotas in the second quarter of 2004.

49.   Genentech breached the Employment Agreement when it failed to promote him to the position of Managed Care Account Manager, failed to pay Rediehs any commissions for Xolair sales to UIC, failed to pay him any commissions for any sales he procured during the third quarter of 2004, and cheated him out of commissions he would have realized based on sales in the pipeline.

50.   As a result of Genentech's breaches of the Employment Agreement, Rediehs has been damaged.

Wherefore, Plaintiff James W. Rediehs respectfully requests entry of judgment in his favor and against Defendant Genentech, Inc. in an amount to be determined at trial as follows:

(a)   compensatory damages, including unpaid commissions and backpay in an amount equal to the compensation and benefits he would have received in the position of Managed Care Account Manager; and

(b)   such further relief as this Court deems equitable and just.

**Jury Demand**

Rediehs demands trial by jury on all claims.

DATED: December 30, 2004                     JAMES W. REDIEHS

                                             by: *[signature]*
                                             one of his attorneys

Sheryl Jaffee Halpern
Thomas J. Verticchio
Patzik, Frank & Samotny Ltd.
150 South Wacker Drive
Suite 900
Chicago, Illinois 60606
(312) 551-8300
(312) 551-1101 (fax)

14

Civil Cover Sheet                                                                                                          Page 1 of 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

**DOCKETED** JAN 03 2005

04 DEC 30 PM 3:28

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s):** JAMES W. REDIEHS | **Defendant(s):** GENENTECH, INC. |
| County of Residence: DuPage | County of Residence: San Mateo, California |
| Plaintiff's Atty: Sheryl Jaffee Halpern<br>Patzik, Frank & Samotny<br>150 South Wacker Dr. #900;<br>Chicago, IL 60606<br>(312) 551-8300 | Defendant's Atty: |

**04C 8357**

**II. Basis of Jurisdiction:** 3. Federal Question (U.S. not a party)

**III. Citizenship of Principal Parties**
(Diversity Cases Only)
    Plaintiff:- 1 Citizen of This State
    Defendant:- 5 Non IL corp and Principal place of Business outside IL

**IV. Origin:** 1. Original Proceeding

**V. Nature of Suit:** 890 Other Statutory Actions

**VI. Cause of Action:** Action under anti-retaliation provisions of False Claims Act, 31 U.S.C. Section 3730(h) and breach of contract.

**VII. Requested in Complaint**
    Class Action: No
    Dollar Demand: unliquidated
    Jury Demand: Yes

**VIII.** This case **IS NOT** a refiling of a previously dismissed case.

**Signature:** _[signature]_
**Date:** 12/30/04

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.** Revised: 06/28/00

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In the Matter of

JAMES W. REDIEHS
V.
GENENTECH, INC.

Case Number:

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

James W. Rediehs

**DOCKETED**

JAN 0 3 2005

| (A) | (B) |
|---|---|
| SIGNATURE: *Sheryl Halpern* | SIGNATURE: *[signed]* |
| NAME: Sheryl Jaffee Halpern | NAME: Thomas J. Verticchio |
| FIRM: Patzik, Frank & Samonty Ltd. | FIRM: Patzik, Frank & Samotny Ltd. |
| STREET ADDRESS: 150 South Wacker Drive, Suite 900 | STREET ADDRESS: 150 South Wacker Drive, Suite 900 |
| CITY/STATE/ZIP: Chicago, Illinois 60606 | CITY/STATE/ZIP: Chicago, Illinois 60606 |
| TELEPHONE NUMBER: (312) 551-8300 | FAX NUMBER: (312) 551-1101 | TELEPHONE NUMBER: (312) 551-8300 | FAX NUMBER: (312) 551-1101 |
| E-MAIL ADDRESS: shalpern@pfs-law.com | E-MAIL ADDRESS: tverticchio@pfs-law.com |
| IDENTIFICATION NUMBER: 6216295 | IDENTIFICATION NUMBER: 6190501 |
| MEMBER OF TRIAL BAR? YES ☐ NO ☑ | MEMBER OF TRIAL BAR? YES ☑ NO ☐ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☑ NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE: | SIGNATURE: |
| NAME: | NAME: |
| FIRM: | FIRM: |
| STREET ADDRESS: | STREET ADDRESS: |
| CITY/STATE/ZIP: | CITY/STATE/ZIP: |
| TELEPHONE NUMBER: | FAX NUMBER: | TELEPHONE NUMBER: | FAX NUMBER: |
| E-MAIL ADDRESS: | E-MAIL ADDRESS: |
| IDENTIFICATION NUMBER: | IDENTIFICATION NUMBER: |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |