# EXHIBIT B



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEPHEN FAUCI,

    Plaintiff,

    v.

GENENTECH, INC.
and DAVID EBERSMAN

    Defendants.

Civil Action No.

**COMPLAINT AND JURY DEMAND**

06 - 10061 RGS

**INTRODUCTION**

This is an action for damages and other relief arising out of the wrongful termination of

Plaintiff's employment and failure to pay earned commissions by Defendants Genentech, Inc.

("Genentech") and Chief Financial Officer, David Ebersman (collectively "Defendants").

Plaintiff Stephen Fauci's claims include wrongful termination in retaliation in violation of the

False Claims Act, 31 U.S.C. §3730 et seq., breach of contract, breach of the implied covenant of

good faith and fair dealing, violation of the Payment of Wages Law, MGL c.149, 27C, 148, and

150, wrongful termination in violation of public policy, and intentional interference with

advantageous business relations.

In support of his claims, Plaintiff further states as follows:

**PARTIES**

1.     Plaintiff Stephen Fauci ("Fauci") is an individual residing at 4 Kelley Lane, in Middleton,

Massachusetts.

2.     Defendant Genentech ("Genentech") is a Delaware corporation, with its principal place of

business at One DNA Way, in South San Francisco, California.

3.     On information and belief, Defendant David Ebersman is the Chief Financial Officer of
Genentech and resides in California.

## JURISDICTION AND VENUE

4.     The District Court of the United States for the District of Massachusetts has original
jurisdiction of this matter under the provisions of 28 U.S.C. §§ 1331 and 1332 in that it is a civil
action arising under the laws of the United States, specifically the False Claims Act, 31 U.S.C.
§3730, et seq. Furthermore, there is complete diversity of citizenship among the parties and the
amount-in-controversy exceeds $75,000.

## FACTUAL BACKGROUND

5.     Genentech employed Fauci for approximately five years as a sales representative, first as
a clinical specialist and then, after promotion in October 2004, as a senior clinical specialist.
During these five years, Fauci was, by all accounts, a superlative and highly sought after
employee.

6.     Throughout his five years of employment with Genentech, Fauci's managers praised him
in every review he received. On January 18, 2005, less than four months before Genentech
wrongfully terminated Fauci (on April 8, 2005), Genentech issued yet another stellar review of
Fauci. Fauci's managers praised Fauci as "disciplined" and "focused" and as "the go-to-guy"
and "leader" who possessed "superior clinical and business acumen." They further wrote,

"[Fauci] consistently deals with others honestly. He is known and seen as the
consummate team player. He always conducts himself in an ethical manner within the
spirit and guidelines of the policies and controls of Genentech."

7.     During his employment with Genentech, Fauci was repeatedly publicly recognized for his
excellent performance by his managers and by his peers. For example, in his last eighteen (18)

2

months of employment with Genentech, Fauci:

- received Genentech's Sales Achievement Award at the National Sales Meeting (February, 2005);
- awarded outstanding ratings on his 2005 PP&R, Genentech's last performance review of Fauci, receiving 5 "exceptional strength" and 8 "solid performance" and no "areas of growth" ratings (January 18, 2005);
- awarded Genentech's Leaders Developing Leaders Award by Director of Sales (December 3, 2004);
- promoted to Senior Clinical Specialist (October 21, 2004);
- won Genentech's Xolair 2004 Unique User Contest (August 23, 2004);
- selected to serve on Genentech's National Rep Panel by management (July, 2004);
- earned Genentech's Recognition Award for 211% increase in business (June 9, 2004);
- received a Sales Achievement Award at Genentech's National Sales Meeting (February, 2004); and
- voted Northeast MVP by his peers (December 15, 2003).

8. By any measure, Fauci had been a consistent, high-performing, highly valued, and

respected employee for Genentech.

9. In or about March 2003, Fauci was internally recruited to serve as a clinical specialist, a

sales representative position, for its Xolair franchise. Xolair was a newly developed, but

expensive, injectable biologic medication Genentech was then preparing to market and sell.

10. Thereafter, Fauci was assigned to "pre-market" Xolair in the Boston North territory,

which included Massachusetts General Hospital, Beth Israel Deaconess Medical Centers (East

and West Campuses) and several physicians in private practice. This territory is considered to be

extremely lucrative and prestigious.

11. Fauci initiated all of the pre-market promotion of Xolair in his territory in anticipation of

its sales launch. In addition, Fauci conducted several "in-services post-launch," or presentations,

at the Massachusetts General Hospital and the Beth Israel Deaconess Medical Center (East and

West Campuses).

3

12.     In the summer of 2003, approximately eight (8) weeks after Genentech launched sales of Xolair, Fauci's colleague Pat Pino, a clinical specialist then assigned to cover Xolair sales in the territory known as Boston South, told Fauci that Fauci's managers had summarily decided to give part of his territory to Pino. Fauci's then managers, John Mastrianni and Kelli Wilson, never discussed this change with Fauci and failed inform Fauci of the change until after Pino told Fauci of the change.

13.     When Fauci asked his managers to explain their reasons for the change, both Mastrianni and Wilson avoided answering his questions for almost two years. When they finally answered Fauci after his repeated inquiries, they told Fauci that Pino "had children" and had more of a need to make a higher income than Fauci, who is single.

14.     Despite giving Fauci a new territory considered less lucrative, his managers refused to replace the accounts they took from him or to reduce his sales quota proportionally, all of which placed him at a professional and financial hardship. Despite such wrongful and discriminatory conduct, Fauci took up the challenge and successfully developed his new territory to the benefit of Genentech.

15.     Later, in 2004, Fauci learned from Genentech's Incentive Compensation department and Data Acquisition department that Genentech's written policies set out in Genentech's Sales Systems Policies & Procedures, a copy of which Fauci's managers never provided, expressly prohibit managers from unilaterally changing a sales representative's territory (i) without prior consultation with and input from the sales representatives affected and (ii) without reasonably adjusting the affected sales representative's territory and/or quota.

16.     Fauci brought theses issues to the attention of his then manager James Sullivan,

4

who replaced Mastrianni as Fauci's manager in July 2004. Sullivan angrily rebuffed Fauci and refused to discuss the matter further.

17. By the end of his first few months as a Xolair clinical specialist, Fauci established himself as a superior performer, a respected peer, and a resource for other Xolair sales representatives with whom they discussed their sales practices. Fauci soon discovered that many of Genentech's Xolair sales representatives were engaged in illegal and wrongful practices explicitly and implicitly encouraged by Genentech's managers to increase sales of Xolair. Increased sales of Xolair would, under Genentech's compensation structure, lead to increased commission payments for these sales representatives and their managers, as well as increase Genentech's profits.

18. One of these wrongful sales practices was known as "marketing the spread." Using "marketing the spread" tactics, sales representative induced physicians to prescribe Xolair to Medicare and Medicaid patients by showing them how to profit from reimbursement payments from the United States government. An example of this would be when a Genentech sales representative would present to the physician a scenario by which the physician would profit from the "spread" or difference in what the physician paid Genentech's Specialty Pharmacy for Xolair and the higher amount billed to the United States government for Xolair. Such practices are widely acknowledged as wrongful and unlawful.

19. Another practice widely encouraged by Genentech was sales representatives' review of confidential patient records to complete Genentech's "Statement of Medical Necessity" forms. The Statement of Medical Necessity forms contain confidential information regarding a patient's health condition, history, and test results and, based on that information, also serve as a patient's

5

prescription for Xolair. Completion of these forms by Genentech's sales representatives unlawfully expedited increased sales of Xolair. As Genentech's in-house counsel later confirmed for Fauci, Genentech's sales representatives' review of patient files and completion of the forms is unlawful.

20.     Genentech's sales representatives kept their own records of individual patients to track patients' prescriptions for Xolair, deliveries of Xolair, and injections of Xolair. Genentech sales representatives used such information to increase the volume of Xolair sales. Such conduct is unlawful.

21.     Genentech regularly directed its sales team, informally and formally, to overcome physicians' concerns about reimbursement rates for Xolair from Medicare and private insurers by providing instruction on manipulating coding and billing processes to obtain higher rates of reimbursement for Xolair by Medicare. For example, Fauci's managers, including Sullivan, Wilson, and Mastrianni, directed Xolair sales representatives to instruct physicians to use Medicare's code 95199, a non-specific allergy code, and other codes in their Xolair billing to Medicare to obtain a higher government reimbursement. Genentech's Xolair sales representatives instructed prescribing physicians on the wrongful use of Medicare billing codes as a means to induce physicians to prescribe Xolair for their patients by showing them how to profit from the increased Medicare payments. Again, such conduct is widely accepted as unlawful.

22.     Given Fauci's ownership of Genentech stock, his concern for Genentech's reputation, brand name, and standing in the industry, and the negative publicity arising from such practices used by other companies, Fauci grew increasingly concerned about these unlawful and wrongful

6

practices and their long term ramifications for Genentech.

23.     In or about February 2004, during Genentech's meetings in Dallas, Texas, Fauci expressed his concerns to John Mastrianni and Kelli Wilson, Fauci's then district and regional managers. Both Mastrianni and Wilson dismissed his concerns.

24.     Indeed, Mastrianni and Robert Rindini, a division manager with Genentech's Xolair marketing partner, Novartis, later led a break out session to discuss "marketing the spread" sales tactics to overcome physicians' reluctance to prescribe Xolair and methods for instructing physicians on the means to profit by using "marketing the spread" billing practices.

25.     During these same meetings, Fauci stated his concerns to other Xolair division colleagues, including James Sullivan, Fauci's future division manager. Sullivan and the others dismissed Fauci's concerns.

26.     In or about June 2004, during Genentech's meetings in Dallas, Texas, Fauci again stated his concerns regarding Genentech's Xolair sales force's wrongful sales practices to Mastrianni and Wilson, as well as to Sullivan and others, which concerns they rebuffed. During these meetings, Mastrianni and Robert Rindini, of Novartis, again led a breakout session to discuss and implement "marketing the spread" sales tactics to increase Xolair sales.

27.     In or about July 2004, Sullivan replaced Mastrianni as Fauci's district manager.

28.     In or about July 2004, Fauci was appointed to serve on Genentech's National Rep Panel. As Wilson stated in her email to announce Fauci's appointment, "Steve [Fauci] will be responsible for soliciting feedback and input from reps in the Patriot Division and Metropolis Division [of Genentech's Xolair franchise]" as a member of the National Rep Board. Indeed, Wilson closed her emailed announcement by stating "Steve's leadership, team spirit, and 'MVP'

7

character will make him a terrific addition to our National Rep. Panel. Congratulations, Steve! I know you will represent the Northeast Region proudly!"

29.     During Sullivan's first divisional meeting in August 2004, Fauci expressly raised his concerns about the widespread wrongful sales practices to Sullivan. Sullivan then told Fauci that it was not his concern and that he should not worry.

30.     Sullivan further directed Fauci to train a new sales representative, Jerry Garnica, to which Fauci agreed. Later, just a few days before Fauci was to begin training Garnica, Fauci and several of his colleagues received urgent phone calls from both Sullivan and Pino, in which Sullivan and Pino expressed their belief that Garnica was a "corporate spy" sent to gather information on the unlawful sales and marketing tactics and strategies used by the sales representatives under Sullivan's supervision. Based on their fears, as well as on their assertions that Garnica was a "homosexual" who "may not fit in," Sullivan and Pino urged their colleagues to be wary of and, if possible, avoid dealing with Garnica. Nonetheless, Fauci continued with his training of Garnica as a Xolair sales representative.

31.     In October 2004, Fauci again told Sullivan of his serious concern regarding the Xolair sales force's illegal and wrongful sales practices. Again, Sullivan summarily dismissed Fauci's concerns and refused to address them further.

32.     Later in October 2004, Fauci again raised these same concerns with Sullivan, Wilson, and others during Genentech's POA meetings in Fort Lauderdale, Florida. Fauci also expressed his concern and alarm regarding Sullivan's vindictive, vulgar, and offensive comments made during a dinner with Fauci and several of Fauci's divisional colleagues. Among other things, Sullivan expressed his anger and resentment that a director of Xolair, Martin Babler, "forced" Sullivan to

8

hire Garnica, whom he referred to as "Martin's boyfriend" and as "one of the girls," and reasserted his suspicions that Garnica was a corporate spy. When Fauci expressed his concerns, Sullivan and Wilson again summarily rebuffed Fauci and told Fauci to concern himself only with his own business.

33.     In anticipation of Genentech's National Rep Panel meetings to be held on November 4, 2004 with Leslie Flynn, Fauci collected information from other clinical specialists regarding their sales practices, questions, and concerns to discuss at the Rep Panel meetings. During his survey and investigation, Fauci again confirmed that Genentech's sales representatives routinely used "marketing the spread" sales tactics, completed patient Statement of Medical Necessity forms, and kept detailed personal records containing confidential patient information and data.

34.     Further, prior to the November 4th Panel meeting, Fauci contacted one of Genentech's in-house attorneys regarding sales representatives' practice of reviewing patient records and completing Statement of Medical Necessity forms. Genentech's attorney told Fauci that no Genentech sales representative should ever complete a patient's Statement of Medical Necessity or contact any of Genentech's Specialty Pharmacies to check on a patient's status, reimbursement, shipment, or injection dates, let alone maintain any such data for their use.

35.     During Genentech's National Rep Panel Meeting on November 4, 2004, Fauci presented the information he gathered from sales representatives in his region and from Genentech's in-house counsel regarding wrongful sales practices. Given the silence and clear discomfort expressed after Fauci completed his presentation, it was clear to him that he had "struck a nerve" with Flynn and others at the meeting.

36.     Throughout this period, Fauci exceeded his sales quotas and continued his leadership-by-

9

example style and his mentorship of other sales representatives. For example, in response to Fauci's research and delivery of scientific articles to his colleague, Pat Pino, Pino emailed, "Thank you for taking the time and for going through the trouble of copying all of these phenomenal articles and sending them to me…. We're proud that you're representing us in California [on the National Rep Board]! Make sure that they don't try to keep you in the home office… We need you back here with the Patriots [in Massachusetts]."

37. In New York City in December 2004, Fauci received Genentech's prestigious Leaders Developing Leaders Award in recognition of his leadership, stature, and performance. During this gathering, Fauci again told Wilson and Sullivan of his concerns regarding the continuing illegal and wrongful sales practices used by Genentech's Xolair sales force under their supervision and management. Again, they summarily rebuffed Fauci's concerns.

38. In separate discussions during the meeting in New York City, Fauci expressly advised several colleagues in his division to stop their wrongful practices. Nonetheless, Genentech promoted the continuing wrongful practices of its sales representatives. For example, Fauci was required to attend a "good practices workshop," in which Judy Newman, a Genentech sales representative from New Jersey, discussed in detail her extensive effort to personally fill out patient Statement of Medical Necessity forms, her daily contacts with Genentech's Specialty Pharmacies, her use of patients' full names to track the status of both insurance coverage and Xolair deliveries to these patients, and even her personal injection of patients with Xolair in physicians' offices when office staff was too busy.

39. Further, Lisa Wheeler, a Genentech sales representative in Connecticut, discussed openly as to how she keeps a notebook of all the patient's in her Connecticut territory that are on Xolair,

10

complete with dates of patients' scheduled Xolair injections. Wheeler also discussed how she assists her physicians' offices by ordering Xolair for them from Genentech's Specialty Pharmacies, even while on maternity leave. Indeed, Wheeler would often show her "notebook" to her managers and colleagues at meetings, even at the 2003 Annual Division Christmas Party, as an example of how she, as a successful Genentech sales representatives, managed her business.

40. Again, Fauci's managers curtly rebuffed concerns regarding these unlawful sales practices, breakout sessions, and workshops.

41. Despite Fauci's complaints, Genentech's managers continued to press Xolair sales representatives to drum up new clients and to increase sales volume by holding contests among their sales representatives, with names such as "Fill the Funnel" and "New Patient Starts," and based third and fourth quarter bonuses on new patient starts. In short, Genentech encouraged its sales representatives to engage in unlawful sales practices to improve Xolair sales and ignored Fauci's openly expressed concerns.

42. During this period, Fauci's managers were already plotting their termination of Fauci to squelch his complaints regarding the wrongful sales practices Genentech encouraged to increase Xolair sales.

43. Fauci's managers openly ridiculed Fauci in discussions with other Genentech employees by, among other things, revealing highly confidential and personal details of Fauci's medical condition. The embarrassing and belittling comments made by Fauci's managers related to his treatment and FMLA leave for depression taken in early 2002. They openly questioned whether Fauci was "still taking his medication" or "seeing his therapist" with other Genentech sales

11

personnel. Such conduct was intended to do nothing more than ruin Fauci's sterling reputation among Genentech's sales representatives who held Fauci in high regard and relied on him for information and guidance in their sales practices.

44.     Following up on Fauci's superlative performance, Fauci received a Sales Achievement Award on February 2, 2005.

45.     Thereafter, Genentech refused to pay Fauci commissions he earned in 2004. By Sullivan's and Wilson's 2004 written performance review of Fauci submitted on January 18, 2005, both managers reported that Fauci achieved 128% of his plan, entitling Fauci to receive an earned commission of $91,108. Indeed, Sullivan and Wilson both reviewed and agreed on the earned commission due Fauci five (5) times, as required by Genentech's meticulous review process and protocol. The amount of the earned commission was not discretionary but rather the result of Genentech's formula to calculate commission based on sales generated.

46.     Fauci's January 2005 review never mentioned any problems with Fauci's performance or with Fauci's use of or reporting of contacts in Genentech's ProRep system. Rather, the review contained lavish praise for his work, leadership, honesty, and ethics.

47.     After giving Fauci his review, however, Genentech refused to pay his earned commission to Fauci. Later, when Fauci inquired, his managers, then frustrated and angry with Fauci's reports of Genentech's wrongful sales practices, falsely maintained that such monies were not due Fauci. Further, Sullivan angrily reprimanded Fauci for Fauci's refusal to approve a "honoraria" payment to a local physician, who also happened to be Pino's friend and neighbor, on grounds that such payments were improper.

48.     At the same time, Fauci's managers again secretly changed Fauci's quota. In violation of

12

Genentech's written policy, Fauci's managers never consulted with Fauci prior to changing his quota. They told him of the change after the fact and when Fauci complained, they refused to respond to him. They also terminated his appointment to Genentech's National Rep Panel.

49.    They again summarily dismissed his complaints and, to add insult to injury, they again ridiculed Fauci for his FMLA leave and suggested that Fauci had "stopped taking his medicine" and "stopped seeing his therapist." Further, Sullivan told Fauci's colleagues that Fauci was "digging his own grave and slitting his own throat" by complaining to Genentech's human resources department. Sullivan told Fauci's colleagues that "[Fauci] must be an idiot to think that human resources is there for the employee; they work for management." Again, when Fauci complained to his managers about their comments and conduct, they summarily rejected his complaints.

50.    Unfortunately, instead of addressing Fauci's grave concerns, Genentech's managers had already implemented their final scheme to create a false pretext for terminating Fauci.

51.    First, from November 2004 to April 8, 2005, Fauci's managers, Sullivan and Wilson, purposely and knowingly withheld crucial information from Fauci critical to his business and territory. They sought to sabotage Fauci's sales effort by refusing to assist Fauci in any business related issues and even refusing to return his business related telephone calls, email, or faxes.

52.    Later, Wilson directed Fauci to stop all contact with Sullivan "until this situation is over." Then, Sullivan and Wilson trumped up their basis for terminating Fauci, which consisted of supposed service problems with three accounts and supposed discrepancies in his reporting of sales contacts with two customers (out of a total of 152) on Genentech's newly implemented ProRep system.

13

53. The ProRep system was a software system designed and implemented as a marketing tool to assist Genentech's marketing department in the development of sales literature and selling tools. In using ProRep, Genentech's management requested sales representatives, who operated on their own, only to ensure that all contact information in their customers' profiles was accurate (ie. correct address, telephone numbers, and fax numbers, etc.). Genentech's management consistently and repeatedly told its sales representatives that ProRep was not mandatory and was not being used as some sort of supervisory or disciplinary tool. Instead, ProRep was to be used as an information-gathering tool to assist Genentech's marketing efforts. Given the ambiguity of Genentech's use of and requirements for the ProRep system, many of its sales representatives never even used the system.

54. Genentech never issued a written policy or a letter of guidance to its sales representatives governing their use of ProRep. Genentech's management also told its sales representatives that ProRep was not a call reporting tool, but merely a tool used for the sole purpose of direct marketing efforts, that it was not a mandatory program, and that management would never use it to discipline or punish its employees.

55. Nonetheless, Sullivan and Wilson did just that – they used ProRep falsely to terminate Fauci as retaliation for his expressed concerns regarding Xolair sales practices and for his complaints concerning Genentech's failure to pay his earned commissions. When Fauci offered to submit documentation to his managers substantiating his ProRep contacts, Sullivan and Wilson refused to discuss the matter with Fauci, let alone review Fauci's documentation. Sullivan and Wilson refused Fauci's offer despite their knowledge that Fauci's ProRep system had repeatedly malfunctioned, requiring Fauci to have Genentech re-install the software two

14

separate times, as recently as December 2004.

56.     On or about April 8, 2005 Fauci was informed by Sullivan, Wilson, and Carnese that he had been terminated. The purported reasons for his termination were reporting discrepancies in his ProRep reporting for two of his one hundred and fifty two clients and for poor performance. Despite Fauci's renewed efforts to substantiate the contacts in question and his unquestioned success generating Xolair sales, Genentech refused to listen to Fauci.

57.     Indeed, during the April 8th call, Sullivan further told Fauci that Sullivan had, "by chance," "run into" three of Fauci's clients during the annual AAAAI meeting in Boston on or about November 11-14, 2004. These clients supposedly told Sullivan that Fauci was not properly supporting their accounts and Sullivan offered this as the reason for Fauci's termination. Not only did Sullivan withhold from Fauci such critical information from November 11, 2004 until April 8, 2005 but, to make matters worse, he apparently earlier asked Pino to deliver the requested information to the clients at issue instead of contacting Fauci, in direct violation to what was common company practice.

58.     Later, however, Genentech's attorney delivered a letter to Fauci after his termination stating Fauci's colleague in a bordering territory brought the clients' complaints to Sullivan's attention.

59.     Sullivan's comments was the first time Fauci had ever heard that these clients had any such problems with his work on their accounts, which accounts had only been reassigned to Fauci from Pino's territory in October 2004, a development about which Pino was extremely upset.

60,     Sullivan's assertions were clearly pretextual as Fauci had documented contacts with each

15

of the clients Sullivan raised just a few weeks earlier. None of the clients ever complained to Fauci. Further, when Fauci attempted to respond to Sullivan's false assertions regarding these clients, Sullivan refused to listen to Fauci. When Fauci asked permission during that April 8th termination conference call for a day or even a few hours to gather and present his paperwork regarding these contacts, as well as to address the assertions regarding his ProRep reporting, Sullivan, Wilson and Carnese refused.

61.     Instead of affording Fauci any opportunity to defend himself or, alternatively, issuing a written or verbal warning or placing Fauci on a remedial PIP plan, Genentech's managers refused to follow the normal company procedures and summarily terminated him.

62.     To make matters even worse, Genentech terminated Fauci just a month before his 5th year anniversary of employment with Genentech, at which point a significant amount of his "in-the-money" stock options would have vested.

63.     Genentech's wrongful termination of Fauci was intended to squelch Fauci's complaints of illegal conduct by Genentech sales representatives and his complaints that Genentech had refused to pay him his earned commissions. Genentech's termination was also intended to prevent a significant portion of his stock options from vesting, which was due to happen less than a month after his termination.

64.     Just as disturbing, Fauci's wrongful termination was also intended to send a message to other Genentech personnel – if you speak up about corporate wrongdoing, Genentech will terminate you, ridicule and embarrass you, and keep compensation due, regardless of your performance level or long years of service to Genentech. By any measure, Genentech's termination of Fauci was disturbing, illegal, and wrongful.

16

65.     After Genentech terminated Fauci, Fauci attempted to obtain new employment.

Eventually, he interviewed with another larger pharmaceutical company, known as Amgen, for a

sales representative position.

66.     Fauci was the final candidate for the position. Fauci was told that there were no other

candidates being considered at the time.

67.     Amgen personnel contacted Genentech regarding Fauci and his employment with

Genentech.

68.     After contacting Genentech, Amgen immediately terminated its pursuit of Fauci without

explanation.

69.     While Genentech at first adamantly denied Fauci's assertions that Genentech personnel

had discussed Fauci with Amgen, Genentech later admitted that such contacts had occurred.

70.     Genentech personnel's statements to Amgen regarding Fauci caused Amgen to terminate

its pursuit of Fauci, thereby causing Fauci to lose the opportunity for employment with Amgen.

## COUNT I
## (Wrongful Termination in Violation of False Claims Act, 31 U.S.C. § 3730, et seq. – Fauci v. Genentech)

71.     Fauci repeats and incorporates herein by reference paragraphs 1 through 70 above.

72.     Genentech wrongfully terminated Fauci in retaliation for his complaints about unlawful

sales practices used by Genentech's sales representatives.

73.     Genentech's termination of Fauci violated 31 U.S.C. § 3730, et seq., a.k.a. the False

Claims Act.

74.     As a result of Genentech's wrongful termination, Fauci suffered significant damages.

17

## COUNT II
### (Violation of Payment of Wages Law – M.G.L. c. 149, 27C, 148 and 150 – Fauci v. all Defendants)

75.    Fauci repeats and incorporates herein by reference paragraphs 1 through 74 above.

76.    Genentech employed Fauci and agreed to pay him an annual salary, stock options, and earned commissions.

77.    Defendants failed and refused to pay Fauci his earned commissions.

78.    Defendants' failure to pay Fauci his earned commissions on a timely basis are willful acts in violation of Massachusetts General Laws, Chapter 149.

79.    Defendants' failure to pay Fauci his earned commissions on a timely basis is a violation of the Payment of Wages Law, sections 27C, 148 and 150 of Chapter 149 of the General Laws of Massachusetts.

80.    Plaintiff Fauci complied with all procedural prerequisites as articulated in G.L. c. 149, and has received written approval from the Massachusetts Attorney General to pursue his wage claims against Defendants.

81.    Fauci suffered extensive damages as a result of Defendants' violations of G.L. c. 149.

82.    As the result of Defendants' willful failure to pay Fauci's earned commissions, Fauci is entitled to recover multiple damages, statutory fines, attorney's fees and litigation costs.

## COUNT III
### (Wrongful Termination in Violation of Public Policy - Fauci v. Genentech)

83.    Fauci repeats and incorporates herein by reference the allegations of paragraphs 1 through 82 above.

84.    From January 2005 until his termination, Fauci complained to his supervisors and other

18

Genentech management that his earned commissions, as confirmed in his performance review, had not yet been paid.

85. Initially, Genentech suggested they would resolve the issue. Shortly thereafter, Genentech advised Fauci that it would not pay him these commissions.

86. Fauci also complained about, *inter alia,* Genentech's illegal practice of marketing the spread.

87. The conduct reported by Fauci is a violation of numerous federal and state criminal laws (including but not limited to 31 U.S.C. § 3730, et seq, and M.G.L. c. 149, § 150, et seq.).

88. Under the pretext of good cause, Genentech then terminated Fauci in retaliation for reporting these violations.

89. As a result of this wrongful termination, Fauci suffered, and continues to suffer, significant damages.

## COUNT IV
### (Breach of Contract – Fauci v. Genentech)

90. Fauci repeats and incorporates herein by reference the allegations of paragraphs 1 through 89 above.

91. Genentech had a contract with Fauci by which it agreed to pay Fauci, among other things, salary, benefits, options, and commissions.

92. Genentech breached its contract with Fauci.

93. As a result, Fauci suffered and continues to suffer significant damages.

19

## COUNT V
### (Breach of the Implied Covenant of Good Faith and Fair Dealing - Fauci v. Genentech)

94.     Fauci repeats and incorporates herein by reference the allegations of paragraphs 1 through 93 above.

95.     Genentech breached the implied covenant of good faith and fair dealing by wrongfully terminating Fauci.

96.     Genentech's actions deprived Fauci of the fruits and benefits of his contract with Genentech. These fruits, include, but are not limited to, Fauci's salary, options, benefits, and reimbursable expenses, loss of vested stock options, loss of income, loss of benefits, and loss of professional opportunities.

97.     As a result of Genentech's breach of the implied covenant of good faith and fair dealing, Fauci suffered substantial damages.

## COUNT VI
### (Intentional Interference with Advantageous Business Relations – Fauci v. Genentech)

98.     Fauci repeats and incorporates herein by reference paragraphs 1 through 97 above.

99.     Genentech interfered with Fauci's prospective business relations with Amgen.

100.    Genentech's aforementioned conduct was done willfully and intentionally, and as a result Fauci suffered significant damages.

WHEREFORE, Fauci demands:

i.      That the Court enter judgment in favor of Fauci on each Count of the Complaint;

ii.     That the Court award Fauci damages, plus his attorney's fees and costs;

20

iii. That the Court enter judgment in his favor and against all Defendants for multiple

damages, plus costs, interest and attorney's fees for their violation of 31 U.S.C.

§3730, et seq. and M.G.L. c. 149, 27C, 148 and 150; and

iv. That the Court enter such additional relief as it deems just and equitable.

## JURY DEMAND

Fauci hereby demands a trial by jury on all issues so triable.

Respectfully submitted,
**STEPHEN FAUCI**

By his attorneys,

David Fanikos, BBO# 564303
Christopher M. Waterman, BBO# 641190
Demeo & Associates, P.C.
One Lewis Wharf
Boston, MA 02110
(617) 263-2600

Dated: January 11, 2006

21